# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### MARSHALL DIVISION

| | |
|---|---|
| ISLAND INTELLECTUAL PROPERTY LLC, | |
| Plaintiff, | |
| | Civil Action No. 2:21-cv-00273-JRG |
| v. | |
| TD AMERITRADE, INC., | PATENT CASE |
| TD AMERITRADE CLEARING, INC., | |
| TD AMERITRADE TRUST COMPANY, | JURY TRIAL REQUESTED |
| TD AMERITRADE HOLDING CORP., and | |
| THE CHARLES SCHWAB CORPORATION, | |
| Defendants. | |

**DEFENDANTS' MOTION TO DISMISS THE COMPLAINT FOR FAILURE TO STATE A CLAIM UNDER FED. R. CIV. P. 12(b)(6)**

## <u>TABLE OF CONTENTS</u>

I.      INTRODUCTION ...................................................................................................................1

II.     STATEMENT OF FACTS .....................................................................................................1

        A.      The Banking Concept Addressed by the Asserted Patents .....................................2

        B.      The '551, '821, and '916 Patents ...........................................................................3

                1.      The '551 Patent ...........................................................................................4

                2.      The '821 Patent ...........................................................................................5

                3.      The '916 Patent ...........................................................................................7

        C.      The '286 Patent .......................................................................................................9

        D.      The '734 Patent .....................................................................................................11

III.    LEGAL STANDARDS ........................................................................................................15

        A.      Abstract Subject Matter Is Ineligible for Patenting Under 35 U.S.C. §101 ..........15

        B.      Patent Ineligibility May Be Resolved on a Motion to Dismiss .............................17

IV.     ARGUMENT .......................................................................................................................18

        A.      Claim 1 of the '551 Patent is Representative of All Asserted Claims ...................19

        B.      The Claims are Directed to an Unpatentable Abstract Idea...................................20

        C.      The Claims Do Not Contain Any Inventive Concept ............................................22

        D.      Prior Litigation Does Not Change the Ineligibility of the Asserted Patents
                under § 101 ............................................................................................................28

V.      CONCLUSION....................................................................................................................30

i

## TABLE OF AUTHORITIES

**Cases**                                                                      **Page(s)**

*Affinity Labs of Texas, LLC v. DIRECTV, LLC*,
    838 F.3d 1253 (Fed. Cir. 2016) ............................................................................16

*Alcon Research Ltd. v. Barr Labs., Inc.*,
    745 F.3d 1180 (Fed. Cir. 2014) ............................................................................18

*Alice Corp. v. CLS Bank Int'l*,
    573 U.S. 208 (2014) ...................................................................................... *passim*

*Amdocs (Israel) Ltd. v. Openet Telecom. Inc.*,
    841 F.3d 1288 (Fed. Cir. 2016) ............................................................................16

*Athena Diagnostics, Inc. v. Mayo Collaborative Servs., LLC*,
    915 F.3d 743 (Fed. Cir. 2019) ........................................................................17, 23

*BASCOM Glob. Internet Servs., Inc. v. AT&T Mobility LLC*,
    827 F.3d 1341 (Fed. Cir. 2016) ............................................................................23

*Berkheimer v. HP Inc.*,
    881 F.3d 1360 (Fed. Cir. 2018) ........................................................................18, 19

*In re Bilski*,
    545 F.3d 943 (Fed. Cir. 2005) ..............................................................................18

*Bozeman Fin. LLC v. FRB of Atlanta*,
    955 F.3d 971 (Fed. Cir. 2020) ..............................................................................22

*buySAFE, Inc. v. Google, Inc.*,
    765 F.3d 1350 (Fed. Cir. 2014) ............................................................................19

*CellspinSoft, Inc. v. Fitbit, Inc.*,
    927 F.3d 1306 (Fed. Cir. 2019) ............................................................................17

*Clear with Computs., LLC v. Altec Indus., Inc.*,
    2015 WL 993392 (E.D. Tex. Mar. 3, 2015), *aff'd*, 636 F. App'x 1015 (Fed.
    Cir. 2016) .............................................................................................................18

*Content Extraction & Transmission LLC v. Wells Fargo Bank*,
    776 F.3d 1343 (Fed. Cir. 2014) ........................................................................17, 18

*Customedia, Techs., LLC v. Dish Network Corp.*,
    951 F.3d 1359 (Fed. Cir. 2020) ........................................................................23, 27

*Cybersource Corp. v. Retail Decisions Inc.*,
    654 F.3d 1366 (Fed. Cir. 2011) ............................................................................22

*Dropbox, Inc. v. Synchronoss Techs., Inc.,*
   815 F. App'x 529 (Fed. Cir. 2020) ...................................................................18

*Elec. Power Grp., LLC v. Alstom S.A.,*
   830 F.3d 1350 (Fed. Cir. 2016).................................................................16, 17, 22

*Enfish, LLC v. Microsoft Corp.,*
   822 F.3d 1327 (Fed. Cir. 2016)..........................................................................25

*Glasswall Sols. Ltd. v. Clearswift Ltd.,*
   754 F. App'x 996 (Fed. Cir. 2018)......................................................................28

*Intell. Ventures I LLC v. Capital One Bank (USA),*
   792 F.3d 1363 (Fed. Cir. 2015).................................................................22, 27, 28

*Intell. Ventures I LLC v. Capital One Fin. Corp.,*
   850 F.3d 1332 (Fed. Cir. 2017)..........................................................................17

*Island Intellectual Prop., LLC v. Stonecastle Asset Mgmt.,*
   463 F. Supp. 3d 490 (S.D.N.Y. 2020).......................................................... *passim*

*Island Intellectual Property LLC v. Deutsche Bank A.G.,*
   2012 WL 286282 (S.D.N.Y. Feb. 6, 2010).....................................................29, 30

*Network Architecture Innovations, LLC v. CC Network Inc.,*
   2017 WL 1398276 (E.D. Tex. Apr. 18, 2017) ...................................................18

*OIP Techs. v. Amazon.com, Inc.,*
   788 F.3d 1359 (Fed. Cir. 2015) ..........................................................................27

*Pres. Wellness Techs. LLC v. Allscripts Healthcare Sols.,*
   2016 WL 2742379 (E.D. Tex. May 10, 2016) ...................................................18

*Reich & Tang Deposit Solutions, LLC et al. v. Island Intellectual Prop. LLC et al.,*
   No. 16-cv-01087-GMS (D. Del. 7, 2017) ...........................................................29

*SAP Am., Inc. v. InvestPic, LLC,*
   898 F.3d 1161 (Fed. Cir. 2018)..........................................................................16

*Smart Sys. Innovations, LLC v. Chi. Transit Auth.,*
   873 F.3d 1364 (Fed. Cir. 2017)..........................................................................22

*In re TLI Commc'ns LLC Pat. Litig. v. AV Auto., LLC. et al.,*
   823 F.3d 607 (Fed. Cir. 2016)............................................................................25

*Ultramercial LLC v. Hulu, LLC,*
   657 F.3d 1323 (Fed. Cir. 2011)..........................................................................30

*Ultramercial, Inc. v. Hulu, LLC*,
    772 F.3d 709 (Fed. Cir. 2014) ..................................................................30

*Uniloc USA, Inc. v. ADP, LLC*,
    279 F. Supp. 3d 736 (E.D. Tex. 2017) *rev'd on other grounds*, 772 Fed. App'x
    980 (Fed. Cir. 2019) .................................................................................18

*Univ. of Fla. Rsch. Found., Inc. v. Gen. Elec. Co.*,
    916 F.3d 1363 (Fed. Cir. 2019) ................................................................17

**Statutes**

35 U.S.C. § 101 ................................................................................ *passim*

**Other Authorities**

12 C.F.R. 329.1(b)(3) ..............................................................................2

12 C.F.R. 329.2 ......................................................................................2

12 C.F.R. 230 ........................................................................................22

57 Fed. Reg. 43337-01, 1992 WL 229626 (Sept. 21, 1992) ....................22

*FDIC Interpretive Ltr. 93-67* (Sept. 27, 1993), 1993 WL 724719 ..............22

Fed. R. Civ. P. 12(b)(6) ...........................................................................17

## I.    INTRODUCTION

Plaintiff Island Intellectual Property LLC ("Island") filed this lawsuit against Defendants TD Ameritrade, Inc., TD Ameritrade Clearing, Inc., TD Ameritrade Trust Company, TD Ameritrade Holding Corp., and The Charles Schwab Corporation (collectively, "Defendants") on July 20, 2021, alleging infringement of U.S. Patent Nos. 7,519,551 ("the '551 patent); 7,933,821 ("the '821 patent"); 8,311,916 ("the '916 patent"); 7,509,286 ("the '286 patent"); and 7,680,734 ("the '734 patent") (collectively, "Asserted Patents"). *See* Dkt. 1. The Asserted Patents are all part of the same patent family and are generally directed to methods and systems for managing the accounting of funds for money swept into interest-earning deposit accounts from client accounts to provide bank clients with interest and FDIC-insurance. In other words, the patentees sought to patent the concept of tracking client funds and account balances in order to provide benefits to bank clients without violating certain federal banking regulations. Importantly, several related patents in this family have already been found invalid under 35 U.S.C. § 101. The Asserted Patents likewise claim nothing more than the same abstract concept, "namely, the use of a multibank depository program to stay within insurance limits," implemented on a generic computing device. *See Island Intellectual Prop., LLC v. Stonecastle Asset Mgmt.*, 463 F. Supp. 3d 490, 495 (S.D.N.Y. 2020). The Asserted Patents are thus invalid as directed to unpatentable subject matter under § 101, and the Complaint should be dismissed.

## II.    STATEMENT OF FACTS

The Complaint alleges that Defendants infringe claim 1 of the '551 patent; claims 19, 21, 24, and 25 of the '821 patent; claim 1 of the '916 patent; claim 1 of the '286 patent; and claims 1, 5, 8, 12, 15, and 16 of the '734 patent. Dkt. 1 ¶¶ 146, 176, 205, 234, 265.

### A.    The Banking Concept Addressed by the Asserted Patents

The Asserted Patents generally disclose methods, systems, and programs for automatically "sweeping" cash balances into FDIC-insured, interest-bearing bank accounts, as well as methods, systems, and programs for flexibly assigning interest rates on FDIC-insured, interest-bearing bank accounts that allow for unlimited transfers per month. The Asserted Patents tried to reconcile these objectives with certain statutory restrictions "prevent[ing] banks and savings institutions from paying interest on certain types of deposit accounts." '551 patent at 1:24-25.

At the time of the alleged invention, 12 C.F.R. 329.2 specified that "no bank shall . . . pay interest on any demand deposit." *Id*. at 1:25-29. The owner of a "demand" account can demand that funds be drawn and paid to another account, "typically implemented via bank drafts, checks, credit cards, and debit cards." *Id*. at 1:31-35. An account is not a "demand" account "[i]f all, or a fixed amount, of the principal must be maintained in order to achieve the particular benefits afforded by that account." *Id*. at 1:36-39. A "demand deposit" includes "any deposit from which the depositor is authorized to make more than six fund 'transfers' during any" statement cycle of at least four weeks. *Id*. at 1:40-43. A "demand deposit" occurs when "the transfer takes place by means of a preauthorized, automatic, or telephonic order specifying the transfer of funds to another account" or "if more than three of the six transfers are authorized to be made by check, draft or debit card." *Id*. at 1:46-52; 12 C.F.R. 329.1(b)(3). However, an "unlimited number of transfers is allowed between two accounts registered to the same person or entity[.]" *Id*. at 1:54-55.

According to the Asserted Patents, "[u]nless the funds of a deposit are held in a money market account (18 U.S.C. § 1832(a)), an account for which a depositor has the ability to make at least six transfers will be deemed a demand account, and no interest will be payable on the funds therein." *Id*. at 1:57-62. One way the Asserted Patents propose to provide owners of demand accounts interest on their funds is to provide an "aggregate insured money market deposit account"

2

linked to multiple client demand accounts "in a manner so as to permit deposit funds to be placed into a demand account from various sources" and through various instruments, "without limitation as to the number of transfers." *Id*. at 2:1-15. Interest is thus earned on deposits because "funds are transferred from individual client accounts to the managed aggregate insured deposit account." *Id*.

As explained below, each of the Asserted Patents is directed to the unpatentable accounting concept of tracking client funds and account balances that are swept into interest-earning deposit accounts in order to work around federal banking regulations on interest-bearing deposit accounts.

### B.    The '551, '821, and '916 Patents

The '551, '821, and '916 patents have identical specifications and are directed to purportedly avoiding violation of federal banking regulations that prohibit more than six electronic withdrawals per period from a single interest-bearing account at a bank. The '551, '821, and '916 patents claim methods for "managing a plurality of client demand accounts so as to allow a banking institution to retain client deposits on the bank's balance sheets while, at the same time, providing the client with the capability of implementing up to an unlimited number of transactions per month and providing the client with interest on their account balances." *See, e.g.*, '551 patent at Abstract. This is allegedly achieved "through the use of an aggregate money market deposit account and an aggregate demand deposit account" which are "held on the books" of the client's bank, but "managed by a third party agent for the client." *Id*. at 3:14-18.

In response to client deposits and withdrawals, the "agent initiates a transfer of funds between the aggregate demand deposit account and the aggregate money market deposit account," where the aggregate money market deposit account is an interest-bearing deposit account where the aggregate balances for all clients are deposited. *Id*. at 3:18-30. The agent "distributes all or a portion of the interest accrued from the aggregate deposit account to individual clients" according to the "relative proportions of each client's funds in the aggregate deposit account" as recorded in

3

the agent's database. *Id.* at 3:52-57. The client thus has two accounts: a "client demand deposit account on the bank's books" and a "return sweep account" on the agent's books, in which the client's transactions occur between the two client accounts. *Id.* at 3:47-51.

The specification states that although a client *could* instruct the bank to transfer funds between the aggregate demand deposit account and the aggregate money market deposit accounts, the "use of an agent provides administrative expediency, rendering the entire operational scheme more attractive to the client as well as the banking institution." *Id.* at 6:4-11 ("A client could open up his own DDA and MMDA accounts, evaluate daily DDA activities, determine if funds should be moved between the DDA and the MMDA, and instruct the bank to transfer the appropriate funds. However, it would be time consuming and inefficient.").

## 1.    The '551 Patent

The '551 patent, entitled "Systems and Methods for Administering Return Sweep Accounts," issued on April 14, 2009. Asserted claim 1 of the '551 patent recites:

1. A computer-implemented method for managing funds for a plurality of client accounts for a plurality of clients whose funds were accepted for deposit in respective client accounts held in the names of the respective clients at a first banking institution, the method comprising:

(a) maintaining a plurality of FDIC-insured and interest-bearing aggregated deposit accounts, each aggregated deposit account held in a different respective bank of a different respective banking institution including an FDIC-insured and interest-bearing aggregated deposit account held at the first banking institution;

(b) maintaining or having maintained an electronic database, on one or more computer-readable media, containing information on funds held by each client in the plurality of aggregated deposit accounts;

(c) administering the aggregated deposit accounts to transfer or have transferred client funds that had been accepted into respective client accounts held in the names of the respective clients at the first banking institution to the aggregated deposit account at the first banking institution except that for clients with a balance of funds in the aggregated deposit account at the first banking institution that equal or exceed a specified

4

amount depositing or having deposited additional funds of that client to one of the aggregated deposit accounts in a different one of the banking institutions;

(d) withdrawing or having withdrawn client funds from the FDIC-insured and interest-bearing aggregated deposit account held at one of the banks of one of the banking institutions more than six (6) times during a month while preserving an insured and interest-bearing status of the FDIC-insured and interest-bearing aggregated deposit account held at the one bank; and

(e) updating or having updated the electronic database based on the transfers to and withdrawals in the plurality of aggregated deposit accounts.

At its core, claim 1 of the '551 patent is directed to managing funds over a plurality of client accounts and comprises the steps of (1) maintaining multiple bank accounts; (2) maintaining a database with information about each account; (3) transferring funds between the accounts; (4) withdrawing money from one of the accounts more than six times in one month; and (5) updating the database to reflect the withdrawal.

## 2.     The '821 Patent

The '821 patent is a continuation of the '551 patent, and is also entitled "Systems and Methods for Administering Return Sweep Accounts." It issued on April 26, 2011. Asserted claims 19, 21, 24, and 25 of the '821 patent recite:

19. A computer-implemented method, comprising:

(a) maintaining or having maintained or accessing an electronic database, on one or more computer readable media, containing client account information for a plurality of client accounts for a plurality of clients whose funds had been accepted for deposit in the names of the respective clients at a first banking institution that includes a first bank in its infrastructure;

(b) maintaining or having maintained or accessing the same or a different electronic database, on one or more computer-readable media, containing aggregated deposit account information for a plurality of Federal Deposit Insurance Corporation (FDIC)-insured and interest-bearing aggregated deposit accounts, held in a plurality of banks of a plurality of banking institutions and including at least one FDIC-insured and interest-bearing aggregated deposit account held at the first bank in the first banking institution, wherein each aggregated deposit account hold funds of a

plurality of client accounts, wherein a client account represents funds of a client held in one or more of the aggregated deposit accounts held by the banks,

(c) allocating, by one or more computers, for more than one of the client accounts, the client funds from these respective client accounts, among more than one of aggregated deposit accounts, so that at least a portion of these client funds are maintained in the aggregated deposit account in the first bank and at least a portion of the client funds are maintained in an aggregated deposit account held in at least one of the banks in one of the different banking institutions;

(d) determining, by the one or more computers, client funds to be withdrawn from the FDIC-insured and interest-bearing aggregated deposit account held at one of the banks of one of the banking institutions more than six (6) times during a month while preserving an insured and interest-bearing status of the FDIC-insured and interest-bearing aggregated deposit account held at the one bank; and

(e) updating or having updated, by the one or more computers, the electronic database based on the allocation of client funds to or from the plurality of aggregated deposit accounts.

21. The computer-implemented method defined in claim 19, further comprising:

causing distribution of interest, by the one or more computers, from said FDIC-insured interest-bearing aggregated deposit accounts to said client accounts; and

updating or having updated, by the one or more computers, one or more of the electronic databases with information about the interest distributed to said client accounts.

24. The computer-implemented method as defined in claim 19, further comprising performing, by the one or more computers, one or more of the following steps:

accessing electronic check deposit data;

accessing electronic Fed wire deposit data;

accessing electronic ACH deposit data;

accessing electronic debit card transaction files;

accessing electronic credit card transaction files;

accessing electronic check presentment data;

accessing electronic ACH debit data;

accessing electronic touch tone bill paying data;

accessing electronic Internet bill paying data.

25. The computer-implemented method as defined in claim 19, further comprising computer-readable instructions that, when executed, allow the one or more computers to receive client data for deposits and/or transfers to and withdrawals and/or transfers from each of their respective client accounts from an Internet telecommunications network.

Claim 19 of the '821 patent is essentially directed to the steps of (1) maintaining a database of client account information; (2) maintaining a separate database containing deposit information about the client accounts; (3) allocating funds between client accounts; (4) determining an amount of funds to be withdrawn from each account; and (5) updating the database to reflect the withdrawal. The asserted dependent claims add basic concepts of distributing interest among the client accounts (claim 21), accessing various types of electronically stored information (claim 24), and receiving the instructions for the claimed method from the internet (claim 25).

**3.      The '916 Patent**

The '916 patent is a continuation of the '821 patent and is also entitled "Systems and Methods for Administering Return Sweep Accounts." It issued on November 13, 2012. Asserted claim 1 of the '916 patent recites:

1. A method, comprising:

(A) accessing, using one or more computers, one or more electronic databases, stored on one or more computers-readable media, the one or more databases comprising:

(1) aggregated account information for a plurality of government backed-insured and interest-bearing aggregated deposit accounts held in a plurality of financial institutions participating in a program including a first depository institution in infrastructure of a first financial institution of the plurality of the financial institutions and a second depository institution in infrastructure of a different financial institution of the plurality of the

7

financial institutions, wherein funds from client accounts of a plurality of clients are aggregated with funds of other client accounts in the aggregated deposit accounts held in the financial institutions, with the aggregated deposit accounts providing non-penalized liquidity for the funds held therein;

(2) client account information for funds, for each of a plurality of respective client accounts, held in one or more of the plurality of the financial institutions, with funds accepted for deposit for respective ones of the clients accounts in the names of the respective clients at the first financial institution, with the client account information comprising a respective balance of funds, from the respective client account, held in each of one or more of the aggregated deposit accounts holding funds of the respective client account; and

(B) allocating, using the one or more computers, for multiple of the client accounts, the client funds of these respective client accounts among more than one of aggregated deposit accounts, so that at least a portion of these client funds are maintained in the aggregated deposit account in the first depository institution and at least a portion of the client funds are maintained in the aggregated deposit account held in the second depository institution in the different financial institution;

(C) determining, using the one or more computers, client funds to be withdrawn from the aggregated deposit account held at one of the depository institutions of one of the financial institutions more than six (6) times during a month while preserving an insured and interest-bearing status of the aggregated deposit account held at the one depository institution;

(D) generating one or more instructions to transfer funds to or from one or more of the respective aggregated deposit accounts in the respective depository institutions in the program through an aggregated demand deposit account based at least in part on the respective allocations determined for the respective depository institutions in the program, wherein the one or more instructions comprise making a withdrawal and/or transfer from the one aggregated deposit account more than six (6) times during the month period to correspond at least with the more than six (6) of the allocations determined over the month period that are withdrawals, while maintaining an insured and interest-bearing status of the aggregated deposit account held at the one depository institution; and

(E) updating or having updated, using the one or more computers, the one or more electronic databases based at least in part on the allocation of client funds to or from the plurality of aggregated deposit accounts.

Claim 1 of the '916 patent is essentially directed to managing funds over a plurality of client accounts and comprises the steps of (1) accessing a database comprising client account and fund information for each of the client accounts; (2) allocating funds between the client accounts; (3) determining the amount of funds to be withdrawn from the client accounts; (4) instructing a transfer of funds between the client accounts; and (5) updating the database to reflect the allocation.

### C.    The '286 Patent

The '286 patent is a continuation-in-part of the '551 patent. It is entitled "Systems and Methods for Money Fund Banking with Flexible Interest Allocation." It issued on March 24, 2009. The '286 patent purports to expand upon the '551, '821, and '916 patents by introducing the concept of "flexible interest allocation," in which multiple tiers of interest rates are offered on client deposits based on certain criteria. '286 patent at 11:4; Abstract.

According to the '286 patent, a bank generally "specifies interest allocation methods . . . by providing parameters that determine a functional relationship between one or more characteristics of a Client account and an interest rate used to compute interest income" on its balances. *Id*. at 11:23-37. Such interest rates may depend on total account balance, age of the account, client address, bank promotions and more. *Id*. at 11:27-33.

The '286 patent suggests determining an interest rate using an interest rate table known as a "tier set," where each row specifies a "range for a selected, primary account characteristic along with the interest rate to be assigned to accounts when their selected characteristic [is] in the specified range." *Id*. at 11:42-50. In one example, the interest rate increases with the balance in the account. *Id*. at 11:62-64. As explained in connection with FIG. 4 of the '286 patent, a bank may wish to pay higher interest rates to accounts with larger balances because they are more profitable than accounts with smaller balances, and a bank may also wish to run interest rate promotions from time-to-time. *Id*. at 12:44-50. Thus, "[d]uring the process of interest allocation for a Client account,

the Agent retrieves the tier set for a particular Client account, and applies the correct tier to the managed account balance to return an interest rate according to which the interest income is credited to the Client's account balance." *Id*. at 12:1-5. The "information necessary to parameterize interest allocation and to determine an interest rate for a Client account" is stored in a database. *Id*. at 12:34-36.

Asserted claim 1 of the '286 patent recites:

1. A method for managing funds of a plurality of respective client accounts associated with a plurality of respective clients participating in a program, comprising:

maintaining a plurality of FDIC-insured and interest-bearing aggregated deposit accounts, each of the aggregated deposit accounts being interest-bearing, with one or more of the aggregated deposit accounts held in each different one of a plurality of financial institutions in the program;

maintaining funds of a plurality of the clients in the plurality of aggregated deposit accounts so that each aggregated deposit account holds funds of a plurality of the clients, with each client account in a subset of the plurality of client accounts having funds in their respective client account over a predetermined amount, with each of the respective client accounts in the subset having funds deposited in a plurality of the aggregated deposit accounts;

maintaining or having maintained or accessing by computer an electronic database, on one or more computer-readable media, comprising a respective balance of funds for each of a plurality of the respective client accounts in the subset and information on funds held by each of the plurality of clients of the subset in the plurality of aggregated deposit accounts;

receiving electronic client transaction data describing debit and/or credit transactions made by a plurality of clients against their respective client accounts;

updating the respective balance of funds in the database associated with each of the respective client accounts in the subset based on one or more debit and/or credit transactions made by the respective client;

determining electronically for each of the plurality of the client accounts in the subset of client accounts a respective interest rate from among a plurality of interest rates in an interest-allocation procedure based at least in part on

10

the updated balance of funds associated with the respective client account in the subset;

calculating electronically a respective interest for a period to be posted to each of a plurality of respective client accounts in the subset, with the respective interest to be posted to a respective client account determined based on the respective interest rate determined for that respective client account in the subset, with the calculating being independent from the respective client account pro rata share in earnings posted to the plurality of the aggregated deposit accounts holding funds of the respective client account;

determining interest earned during the period by each of the plurality of aggregated deposit accounts in the program; and

posting electronically the respective interest calculated for each of the plurality of respective client accounts based on the respective interest rate determined for the respective client account.

At its core, claim 1 of the '286 patent is directed to a method for managing funds in a plurality of client accounts, comprising the steps of (1) maintaining a plurality of aggregated deposit accounts; (2) maintaining client funds in each aggregated account; (3) maintaining a database of funds in the client accounts and held by clients in each of the aggregated accounts; (4) receiving data about client credit or debit card transactions; (5) updating the client account balance of funds to reflect those transactions; (6) determining, based on the updated balance data, the interest rate applicable to each client account; (7) determining the actual interest earned by each account; and (8) posting the interest to each client account.

### D.    The '734 Patent

The '734 patent is a continuation-in-part of the '551 patent. It is entitled "Money Fund Banking System" and issued on March 16, 2010. The '734 patent also seeks to "provide depositors of demand accounts with interest from the funds on deposit while simultaneously providing unlimited (or at least six) transfers of funds therein." '734 patent at 2:9-18; 1:11-2:37.

11

The '734 patent discloses a plurality of client accounts that accept deposits and withdrawals and are managed by an administrator. *Id*. at 3:49-4:10. The sum of all processed credits and debits associated with all withdrawals is calculated for all of the administrator's clients to determine net account activity. *Id*. at 4:25-29. The net account activity determination "is then used to determine a net credit/debit for the single deposit account held at the bank that contains all of the funds of all of the administrator's clients; the deposit account must be debited or credited to account for all clients' deposits and withdrawals" during the calculation period. *Id*. at 39-43. Funds are then transferred between accounts accordingly and sent to the bank for execution. *Id*. at 4:38-5:8.

After the account "has been credited or debited in accordance with the [net account activity] determination for that period of the sum of the deposits and withdrawals from clients, and the interest earned on the single deposit account, this information is transferred back to the administrator's deposits database," after which the administrator allows a client to access their fund status. *Id*. at 5:39-61.

Asserted claims 1, 5, 8, 12, 15, and 16 of the '734 patent recite:

1. A method for managing a plurality of client accounts for a plurality of clients, comprising:

> accessing, by one or more computers, a database comprising information for each client account that has client account funds aggregated with funds of a plurality of other of the client accounts and are held in one or more FDIC-insured and interest-bearing aggregated deposit accounts held in one or more FDIC insured banking institutions, with the information for each of the client accounts including information on each client's funds held in said one or more insured and interest-bearing aggregated deposit accounts; and

> administering, by the one or more computers, deposits to and withdrawals from each of a plurality of said client accounts, including more than six withdrawals in a month from each of a plurality of the client accounts, with one or more of said withdrawals made by debit card;

> determining, by the one or more computers, on a regular basis one or more net transactions as sums of said deposits to and withdrawals from said client accounts;

12

determining, by the one or more computers, from said net transactions whether to deposit funds to or withdraw funds from said one or more FDIC-insured and interest-bearing aggregated deposit accounts;

making or having made more than six withdrawals in a month of funds from one of the FDIC-insured and interest-bearing aggregated deposit accounts via at least one intermediate bank that is different from the one or more FDIC insured banking institutions; and

updating, by the one or more computers, the database with deposits to and withdrawals from said each client account.

5. The method of claim 1, further comprising holding client account funds for at least one of the client accounts in a plurality of the FDIC-insured and interest-bearing aggregated deposit accounts, each of the plurality of aggregated deposit accounts held in a different FDIC insured banking institution.

8. A method for managing a plurality of client accounts for a plurality of clients, comprising:

accessing, by one or more computers, a database comprising information for each client account that has client account funds aggregated with funds of a plurality of other of the client accounts and are held in one or more FDIC-insured and interest-bearing aggregated deposit accounts held in one or more FDIC-insured banking institutions, with the information for each of the client accounts including information on each client's funds held in said one or more insured and interest-bearing aggregated deposit accounts; and

administering, by the one or more computers, deposits to and withdrawals from each of a plurality of said client accounts, including more than six withdrawals in a month by check or debit card or ACH from each of a plurality of the client accounts, with one or more of said withdrawals made by debit card;

determining, by the one or more computers, on a regular basis one or more net transactions as sums of said deposits to and withdrawals from said client accounts;

determining, by the one or more computers, from said net transactions whether to deposit funds to or withdraw funds from said one or more FDIC-insured and interest-bearing aggregated deposit accounts;

making or having made more than six withdrawals in a month of funds from one of the FDIC-insured and interest-bearing aggregated deposit accounts via at least one intermediate bank that is different from the one or more FDIC insured banking institutions; and

updating, by the one or more computers, the database with deposits to and withdrawals from said each client account.

12. The method of claim 8, further comprising holding client account funds for at least one of the client accounts in a plurality of the FDIC-insured and interest-bearing aggregated deposit accounts, each of the plurality of aggregated deposit accounts held in a different FDIC-insured banking institution.

15. The method as defined in claim 8,

> further comprising holding some client account funds for at least one of the client accounts in at least one interest-bearing aggregated deposit account that is not FDIC-insured, and further comprising

> maintaining in the database information on the client's funds held in said at least one interest-bearing aggregated deposit account that is not FDIC-insured; and

> determining from said net transactions whether to deposit funds to or withdraw funds from the at least one interest-bearing aggregated deposit account that is not FDIC-insured.

16. The method as defined in claim 1,

> further comprising holding some client account funds for at least one of the client accounts in at least one interest-bearing aggregated deposit account that is not FDIC-insured, and further comprising

> maintaining in the database information on the client's funds held in said at least one interest-bearing aggregated deposit account that is not FDIC-insured; and

> determining from said net transactions whether to deposit funds to or withdraw funds from the at least one interest-bearing aggregated deposit account that is not FDIC-insured.

Claims 1 and 8 of the '734 patent are essentially directed to a method for managing a plurality of client accounts comprising the steps of (1) accessing a database containing fund information for client accounts that are aggregated; (2) depositing and withdrawing money from each account, in which there are more than six withdrawals a month and one is by debit card; (3) routinely determining the net transactions for each client account; (4) determining whether funds need to be deposited to or withdrawn from the aggregated accounts based on the net transactions;

14

(5) making more than six withdrawals in a month through at least one intermediate bank; and (6) updating the database to reflect the transactions. The dependent claims add the basic concepts of holding each of the client accounts in a different FDIC insured bank (claims 5 and 12) and maintaining database information on client funds held in at least one account that is not FDIC-insured (claims 15 and 16).

## III.    LEGAL STANDARDS

### A.    Abstract Subject Matter Is Ineligible for Patenting Under 35 U.S.C. §101

Under 35 U.S.C. § 101, "[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of [the Patent Act]." Claims directed to laws of nature, natural phenomena, and abstract ideas are ineligible for patenting under § 101. *Alice Corp. v. CLS Bank Int'l*, 573 U.S. 208, 216 (2014). As the Supreme Court explained in *Alice,* "the abstract ideas category embodies the longstanding rule that an idea of itself is not patentable." *Id.* at 218 (quotations omitted). To distinguish between claims that set forth patent-ineligible subject matter and those that "integrate the building blocks into something more," courts employ a two-part test. *Id.* at 217.

First, the court must "determine whether the claims at issue are directed to a patent-ineligible concept." *Id.* at 218. This "step of the inquiry calls upon us to look at the 'focus of the claimed advance over the prior art' to determine if the claim's 'character as a whole' is directed to excluded subject matter." *Affinity Labs of Texas, LLC v. DIRECTV, LLC*, 838 F.3d 1253, 1257 (Fed. Cir. 2016). Courts must distinguish "ineligible abstract-idea-based solutions implemented with generic technical components in a conventional way from the eligible technology-based solution and software-based invention that improves the performance of the computer system

15

itself." *Amdocs (Israel) Ltd. v. Openet Telecom. Inc.*, 841 F.3d 1288, 1299 (Fed. Cir. 2016) (quotations omitted). If the claims lack the "specificity required to transform a claim from one claiming only a result to one claiming a way of achieving it," they are likely directed at only abstract ideas. *SAP Am., Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1167–68 (Fed. Cir. 2018). Claims that "merely present[] the results of abstract processes of collecting and analyzing information" are directed to abstract ideas. *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1354 (Fed. Cir. 2016). "In a similar vein, [the Federal Circuit has] treated analyzing information by steps people [can] go through in their minds, or by mathematical algorithms, without more, as essentially mental processes within the abstract-idea category." *Id.* at 1354.

Second, if the challenged claims are directed towards a patent-ineligible concept, the court then "consider[s] the elements of each claim both individually and as an ordered combination to determine whether the additional elements transform the nature of the claim into a patent eligible application." *Alice*, 573 U.S. at 217 (quotations omitted). To overcome step 2, the claim limitations must contain an inventive concept that "involve[s] more than performance of well-understood, routine, [and] conventional activities previously known to the industry." *Content Extraction & Transmission LLC v. Wells Fargo Bank*, 776 F.3d 1343, 1347–48 (Fed. Cir. 2014) (quotations omitted). "[T]he mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention." *Alice*, 573 U.S. at 223. Claims that do not require "anything other than off-the-shelf, conventional computer, network, and display technology for gathering, sending, and presenting the desired information," fail under *Alice* step two. *Elec. Power*, 830 F.3d at 1355. Further, claim elements described in "purely functional terms" do not provide an inventive concept because they are "not a specific improvement to the way computers operate." *Univ. of Fla. Rsch. Found., Inc. v. Gen. Elec. Co.*, 916 F.3d 1363, 1368 (Fed. Cir. 2019) (quotations omitted);

*see also Intell. Ventures I LLC v. Capital One Fin. Corp.*, 850 F.3d 1332, 1341 (Fed. Cir. 2017) ("organizing, mapping, identifying, defining, detecting, and modifying" are examples of purely functional terms). Rather than providing purely functional terms that "merely describe the functions of the abstract idea itself, without particularity," *Capital One Fin. Corp.*, 850 F.3d at 1341, claims must specify "how the desired result is achieved" to satisfy the *Alice* step two. *Elec. Power*, 830 F.3d at 1355.

### B. Patent Ineligibility May Be Resolved on a Motion to Dismiss

"Patent eligibility under §101 is a question of law based on underlying facts that may be resolved on a Rule 12(b)(6) motion when the undisputed facts require a holding of ineligibility." *Athena Diagnostics, Inc. v. Mayo Collaborative Servs., LLC*, 915 F.3d 743, 749 (Fed. Cir. 2019) (citations omitted). To prevent dismissal, allegations that a patent is inventive must be plausible, specific, and tied to an asserted claim. *CellspinSoft, Inc. v. Fitbit, Inc.*, 927 F.3d 1306, 1317 (Fed. Cir. 2019). As for computer technology, raising a factual issue about patent eligibility requires allegations that particular claim elements provide a specific improvement in how the claimed result is achieved. *Dropbox, Inc. v. Synchronoss Techs., Inc.*, 815 F. App'x 529, 538 (Fed. Cir. 2020) ("[A]ny allegation about inventiveness, wholly divorced from the claims or the specification does not defeat a motion to dismiss; only plausible and specific factual allegations that *aspects of the claims* are inventive are sufficient.") (quotations omitted) (emphasis in original).

On a motion to dismiss, a court need only address the claims asserted in the complaint. *See, e.g.*, *Alcon Research Ltd. v. Barr Labs., Inc.*, 745 F.3d 1180, 1193 (Fed. Cir. 2014); *Uniloc USA, Inc. v. ADP, LLC*, 279 F. Supp. 3d 736, 741 (E.D. Tex. 2017) (declining to consider invalidity of unasserted claims) *rev'd on other grounds*, 772 Fed. App'x 980 (Fed. Cir. 2019). Even when there are multiple asserted claims, courts need not assess each claim individually if "all the claims are 'substantially similar and linked to the same abstract idea.'" *Content Extraction*, 776 F.3d at 1348.

17

The patentee bears the burden of persuading a court that other claims warrant review independent of a representative claim. *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1365 (Fed. Cir. 2018) ("Courts may treat a claim as representative . . . if the patentee does not present any meaningful argument for the distinctive significance of any claim limitations not found in the representative claim[.]").

As this court has held, claim construction is not required before conducting a § 101 analysis. *See Clear with Computs., LLC v. Altec Indus., Inc.*, 2015 WL 993392, at *3 (E.D. Tex. Mar. 3, 2015), *aff'd*, 636 F. App'x 1015 (Fed. Cir. 2016); *Network Architecture Innovations, LLC v. CC Network Inc.*, 2017 WL 1398276, at *3 (E.D. Tex. Apr. 18, 2017). "Where it is clear that claim construction would not affect the issue of patent eligibility, there is no requirement that the court go through that exercise before addressing the eligibility issue." *Pres. Wellness Techs. LLC v. Allscripts Healthcare Sols*., 2016 WL 2742379, at *6 (E.D. Tex. May 10, 2016) (citation omitted); *see also In re Bilski*, 545 F.3d 943, 951 (Fed. Cir. 2005) (finding subject matter patent ineligible without claim construction); *buySAFE, Inc. v. Google, Inc.*, 765 F.3d 1350, 1355 (Fed. Cir. 2014) (affirming a district court's finding of invalidity under § 101 at the pleadings stage).

## IV.    ARGUMENT

The Asserted Patents are generally directed to "computer-implemented" methods and systems for managing the accounting of funds for money swept into interest-earning deposit accounts from client accounts to provide bank clients with interest and FDIC-insurance. The role of the "computer" in the claims of the Asserted Patents is merely to host electronic databases, allocate funds between various accounts, and calculate an interest rate based on a table. *See, e.g.*, '551 patent at cl. 1; '286 patent at cl. 1; '734 patent at cl. 1. The Asserted Patents admit to nothing more than implementing this basic accounting concept using a computer to increase administrative efficiency. *See, e.g*., '551 patent at 6:4-11 ("A client could open up his own DDA and MMDA accounts, evaluate daily DDA activities, determine if funds should be moved between the DDA

18

and the MMDA, and instruct the bank to transfer the appropriate funds. However, it would be time consuming and inefficient.").

## A.    Claim 1 of the '551 Patent is Representative of All Asserted Claims

"Courts may treat a claim as representative . . . if the patentee does not present any meaningful argument for the distinctive significance of any claim limitations not found in the representative claim[.]" *Berkheimer*, 881 F.3d at 1365. Each of the Asserted Patents is directed to the same basic steps for managing the accounting of client funds swept into interest-earning deposit accounts, and generally consist of (1) maintaining multiple bank accounts; (2) maintaining an electronic database with information about each account; (3) instructing a computer to transfer funds between the accounts; (4) withdrawing money from one of the accounts more than six times in one month; and (5) updating the electronic database to reflect the withdrawal.

This concept is represented by claim 1 of the '551 patent. The '551, '821, and '916 patents, which share a specification, claim a nearly identical method performed with substantially the same steps. *Compare* claim 1 of the '916 patent and claim 19 of the '821 patent *with* claim 1 of the '551 patent. The claims of the other Asserted Patents do not materially differ from claim 1 of the '551 patent. For example, the '286 patent merely adds the concept of determining the interest rate applicable to a particular account based on a table created by the bank at which the client account is kept. *See, e.g.*, '286 patent at 11:42-50. Additionally, the claims of the '734 patent merely add an account activity metric calculated from the sum of all processed credits and debits associated with all withdrawals from the client account. *See, e.g.*, '734 patent at 4:11-47. And, as discussed above, the dependent claims of the Asserted Patents merely add the basic concepts of:

- Distributing interest among the plurality of client accounts ('821 patent, cl. 21);

- Accessing various types of electronically stored client information ('821 patent, cl. 24);

- Receiving the instructions for the method over the internet ('821 patent, cl. 25);

- Holding each of the client accounts in a different FDIC insured bank ('734 patent, cl. 5 and 12); and

- Maintaining database information on client funds held in at least one non FDIC-insured account ('734 patent, cl. 15 and 16).

### B.     The Claims are Directed to an Unpatentable Abstract Idea

Under step 1 of *Alice*, the Asserted Patents fail because they are directed to fundamental financial practices that are unpatentable abstract ideas. Each of the Asserted Patents is directed to the same basic steps for managing the accounting of funds for money swept into interest-earning deposit accounts from client accounts to provide bank clients with interest and FDIC-insurance. The Asserted Patents recite an overly verbose description of very basic steps, consisting of (1) maintaining multiple bank accounts; (2) maintaining a database with information about each account; (3) transferring funds between the accounts; (4) withdrawing money from one of the accounts more than six times in one month; and (5) updating the database to reflect the withdrawal. Each asserted claim is directed to these same abstract concepts.

Importantly, related Island patents with claims directed to "use of a multibank depository program to stay within insurance limits" and "dividing and transferring funds to stay within insurance limits" have already been invalidated under § 101 as directed to unpatentable and "fundamental economic practice[s]." *Stonecastle*, 463 F. Supp. 3d 490, 495 (S.D.N.Y. 2020). In *Stonecastle*, the court rejected Island's argument that the claims "improve the way computers operate through logical structures and processes" because the portions of the claims that disclose computerization did "nothing more than spell out what it means to apply it on a computer." *Id*. at 496 (quoting *Intell. Ventures I LLC v. Capital One Bank (USA)*, 792 F.3d 1363, 1370 (Fed. Cir. 2015).) The claims found invalid in four of the five patents at issue in *Stonecastle* are in the same patent family as the Asserted Patents. Many limitations of the claims found ineligible in

*Stonecastle* are effectively identical in substance to the limitations of the Asserted Patents, with only superficial differences in wording.

In particular, the patents found ineligible in *Stonecastle* covered the same multibank aggregated deposit account program and electronic bookkeeping claimed in the Asserted Patents, but added the concept of "reciprocal deposits." The Court in *Stonecastle* concluded that each of those elements was unpatentable and constituted a fundamental financial process. *Stonecastle*, 463 F. Supp. 3d at 490. Here, the Asserted Patents do not recite the concept of reciprocal deposits, but rather add the concepts of allocating interest according to predetermined interest rates (the '286 patent) and summing processed credits and debits associated with all withdrawals to be calculated as a net account activity determination (the '734 patent). As detailed above, these concepts are fundamental financial practices like those invalidated in *Stonecastle*. Indeed, the concept of tiered interest rates has been formally regulated since at least 1992 and is nothing new. *See, e.g.*, *FDIC Interpretive Ltr. 93-67* (Sept. 27, 1993), 1993 WL 724719 (addressing required disclosures for tiered-rate accounts); 57 Fed. Reg. 43337-01, 1992 WL 229626 (Sept. 21, 1992) (adopting Truth in Savings Act Regulation DD, 12 C.F.R. Part 230).

Courts have often found similar claims reciting computerized financial transactions and accounting to be abstract and patent ineligible. *See, e.g.*, *Bozeman Fin. LLC v. FRB of Atlanta*, 955 F.3d 971, 978 (Fed. Cir. 2020) (finding a method of receiving data from two financial records, storing that data, comparing that data, and displaying the results is abstract); *Smart Sys. Innovations, LLC v. Chi. Transit Auth.*, 873 F.3d 1364, 1371 (Fed. Cir. 2017) ("[T]he recent case law has reiterated that whatever bells and whistles may be added, when reduced to their core, claims directed to the performance of certain financial transactions—and paying a fare is a financial transaction—must be categorized as involving abstract ideas.") (citations omitted);

*Capital One Bank (USA)*, 792 F.3d at 1367 (finding claims directed to tracking financial transactions to determine whether they exceed a pre-set spending limit to be abstract where the only alleged inventive concept was increased efficiency associated with computer); *Elec. Power Grp.*, 830 F.3d at 1356 ("[E]ssentially result-focused, functional character of claim language has been a frequent feature of claims held ineligible under § 101, especially in the area of using generic computer and network technology to carry out economic transactions"); *Cybersource Corp. v. Retail Decisions Inc.*, 654 F.3d 1366, 1373 (Fed. Cir. 2011) (a pre-*Alice* decision finding unpatentable methods of detecting credit card fraud over the internet because "computational methods which can be performed entirely in the human mind are the types of methods that embody the "basic tools of scientific and technological work" that are free to all men and reserved exclusively to none.").

Because the patents "simply seek[] to monopolize [a long-understood concept] by masking it through the medium of technology," they are abstract and, as explained below, do not include any inventive concept that would transform the abstract idea of maintaining a multibank depository program. *Stonecastle*, 463 F. Supp. 3d at 497-98 (quoting *Iron Gate Sec., Inc. v. Lowe's Cos., Inc.*, 2016 U.S. Dist. LEXIS 101796, at *8 (S.D.N.Y. Aug. 3, 2016)). Thus, the claims of the Asserted Patents fail step 1 of the *Alice* test and are invalid under § 101.

### C. The Claims Do Not Contain Any Inventive Concept

At step two of *Alice*, the Court should "search for an 'inventive concept.' The 'inventive concept' may arise in one or more of the individual claim limitations or in the ordered combination of the limitations." *BASCOM Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1349 (Fed. Cir. 2016) (quoting *Alice*, 573 U.S. at 217). That inventive concept must offer "significantly more than the abstract idea itself, and cannot simply be an instruction to implement or apply the abstract idea on a computer." *Id*.

22

The Asserted Patents lack any inventive concept because they merely claim the implementation of fundamental financial practices with generic computerization. Such a recitation is insufficient to "transform the claimed abstract idea into a patent-eligible application." *Alice*, 573 U.S. at 221 (citations and quotations omitted). "*Mayo* made clear that transformation into a patent-eligible application requires 'more than simply stat[ing] the [abstract idea] while adding the words apply it.'" *Id*. Thus, "the mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention." *Id*. at 223; *see also Customedia*, *Techs., LLC v. Dish Network Corp.*, 951 F.3d 1359, 1365 (Fed. Cir. 2020) (While improvements to computer functionality can be patent-eligible, "the claims must be directed to an improvement to the functionality of the computer or network platform itself," not "a process that qualifies as an abstract idea for which computers are invoked merely as a tool.") (quotations omitted).

The specification of the '551, '821, and '916 patents mentions computerization only *once*. *See, e.g.*, '551 patent at 1:16-19 ("The invention relates generally to computerized banking techniques and, more specifically, to techniques by which deposits are kept on a bank's balance sheet while being administered as sweep account funds by a third party."). The '286 patent states that the methods of the alleged invention "may be programmed as one or more modules in convenient commercial programming languages" for use on "standard computer readable media." '286 patent at 25:45-51. Additionally, the '734 patent states that the methods have "been implemented on a mainframe computer" running on "a mixed SNA and TCP/IP network," "dial-up media," and "Ethernet local area network." '734 patent at 2:65-3:19.

These claims do not purport to improve the functioning of the computer itself, but merely require that the abstract concepts be performed "electronically." *See, e.g.*, '551 patent at claim 1 ("maintaining…an electronic database, on one or more computer-readable media…"); '821 patent

at claim 19 ("accessing an electronic database…," "allocating, by one or more computers…," "determining, by the one or more computers…," "updating, or having updated, by the one or more computers, the electronic database…"); *id*. at claims 21, 24, 25 ("The computer implemented method…"); '916 patent at claim 1 ("accessing, using one or more computers, one or more electronic databases…," "allocating, using the one or more computers…," "determining, using the one or more computers…," "updating, or having updated, by the one or more computers…"); '286 patent at claim 1 ("accessing by computer an electronic database…," "receiving electronic client transaction data…," "determining electronically…," "calculating electronically…," "posting electronically…"); '734 patent at claims 1 and 8 ("accessing, by one or more computers…," "administering, by the one or more computers…," "determining, by the one or more computers…," "updating, by the one or more computers…"). Like the claims held ineligible in *Alice*, the Asserted Patents are nothing more than an instruction to apply the abstract ideas of managing multibank depository programs "using some unspecified, generic computer." *Alice*, 573 U.S. at 226.

The claims rely on generic elements and functional terms, such as "maintaining" a plurality of bank accounts and an electronic database, "administering" fund transfers, "withdrawing" funds from the accounts, and "updating" the electronic database. These generic elements recite no more than the abstract idea of managing bank accounts to remain within insurance limits and provide bank clients with interest. The claims also are not "directed to an improvement to computer functionality." *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1335 (Fed. Cir. 2016). The "problem described by the [Asserted Patents] is not a shortcoming in existing computerized methods of" managing funds over a plurality of client accounts, but rather the problem that the multibank depository accounts are themselves intended to solve is "regulatory burdens and associated costs on banks." *Stonecastle*, 463 F. Supp. 3d at 496 ("If anything, the specification

implies that the patent eschews limitation to any particular 'logical structures or processes.'"). Thus, these generic and functional elements of the claims do not add an inventive step to the abstract idea. *See In re TLI Commc'ns LLC Pat. Litig. v. AV Auto., LLC.*, 823 F.3d 607, 613 (Fed. Cir. 2016) ("It is well-settled that mere recitation of concrete, tangible components is insufficient to confer patent eligibility to an otherwise abstract idea. Rather, the components must involve more than performance of well-understood, routine, conventional activities previously known to the industry.") (citations and quotations omitted).

Nor do the claims "effect an improvement in any other technology or technical field." *Alice*, 573 U.S. at 225. Just as the *Stonecastle* court noted in finding Island's related patents ineligible, it is revealing that the problem to be solved, as described in the specification of the Asserted Patents, has nothing to do with a deficiency in presently-available computer or other electronic systems which might theoretically be improved by a patent eligible invention. *Stonecastle*, 463 F. Supp. 3d at 496. Instead, the Asserted Patents describe overcoming regulatory burdens and associated limitations. *See, e.g.*, '286 Patent 1:30-33 ("These statutes and accompanying regulatory scheme limit investors and depositors seeking investments and deposits having a lower risk profile to a rather limited selection of choices, all of which suffer inhibiting constraints."). And the Asserted Patents offer no improvements to industry-standard and widely available computer systems to accomplish these results. Rather, they describe only the use of generally-available computer systems as tools to perform what would otherwise be human-performable steps. *See, e.g.*, '551 patent at 1:16-19; '286 patent at 25:45-51; '734 patent at 2:47-3:19.

"[T]he relevant question is whether the claims here do more than simply instruct the practitioner to implement the abstract idea . . . on a generic computer." *Alice*, 573 U.S. at 225. Here, they do not. Representative claim 1 of the '551 patent is instructive; it recites the following

basic steps: (1) maintaining multiple bank accounts; (2) maintaining a database with information about each account; (3) transferring funds between the accounts; (4) withdrawing money from one of the accounts more than six times in one month; and (5) updating the database to reflect the withdrawal. The claim elements, separately and as an ordered combination, merely instruct the reader to carry out the basic steps necessary to manage a multibank depository program. Maintaining bank accounts, transferring funds, updating a database, calculating and posting interest—all of these are "generic computer functions" that do not constitute an inventive concept. *Id.* ("[U]se of a computer to obtain data, adjust account balances, and issue automated instructions[:] all of these computer functions are 'well-understood, routine, conventional activit[ies]' previously known to the industry." (quoting *Mayo*, 566 U.S. at 73)).

In its Complaint, Island argues that the Asserted Patents allow for the "efficient and effective management of funds across accounts at different banking institutions" which "help[] to make the distribution of client funds across aggregated deposit accounts at multiple banking institutions faster and more efficient, and improved the functioning of the overall technological process of computerized deposit sweep systems." Dkt. 1 ¶ 33; *see also* ¶ 37 ("This unconventional feature enabled the process of deposit sweep systems to be accomplished faster and more efficiently…"). However, using a computer to carry out the implementation of an abstract idea more quickly is not an inventive concept. *See Customedia*, 951 F.3d at 1364-65 ("[I]t is not enough, however, to merely improve a fundamental practice or abstract process by invoking a computer merely as a tool. . . . The only improvements identified in the specification are generic speed and efficiency improvements inherent in applying the use of a computer to any task. Therefore, the claimed invention is at most an improvement to the abstract concept of targeted advertising wherein a computer is merely used as a tool."); *see also OIP Techs. v. Amazon.com, Inc.*, 788 F.3d

1359, 1363 (Fed. Cir. 2015) ("[R]elying on a computer to perform routine tasks more quickly or more accurately is insufficient to render a claim patent eligible."); *Capital One Bank (USA)*, 792 F.3d at 1370 ("[O]ur precedent is clear that merely adding computer functionality to increase the speed or efficiency of the process does not confer patent eligibility on an otherwise abstract idea.").

Island's Complaint characterized routine and conventional claim elements as "novel" and "inventive." *See, e.g.*, Dkt. 1 ¶ 31 ("[C]laim 1 [of the '551 patent] includes novel elements, including the "maintaining" steps, and the withdrawing client funds more than six times during a month while preserving an insured and interest-bearing aggregated deposit account."); ¶ 33 (noting "inventive database structures" of '821 patent comprising "information of individual client accounts and aggregated deposit accounts"); ¶ 35 (describing as "unconventional" the step of the '821 patent "distributing interest from aggregated accounts to individual client accounts"); ¶ 41 (describing as novel the "allocating" step of the '916 patent); ¶ 47 (characterizing the "unconventional and inventive interest determination and calculation" of the '286 patent); ¶ 48 ("[T]he use of aggregated accounts in the context of a deposit sweep product was new."); ¶ 55 (characterizing "netting transactions of client accounts" as unconventional and inventive). These alleged "inventive concepts" are not directed to computer functionality, however. They are each directed to fundamental accounting practices that, when practiced on a computer, are accomplished faster or more efficiently, which does not confer patent eligibility on the abstract idea of the asserted claims. *See, e.g.*, *Capital One Bank (USA)*, 792 F.3d at 1370.

Island's attempts to allege its way into patent-eligibility are of no moment in the analysis: they are not plausible *factual* allegations but conclusory legal statements intended to plead around the § 101 problem they know they have. *See Glasswall Sols. Ltd. v. Clearswift Ltd.*, 754 F. App'x 996, 999 (Fed. Cir. 2018) (assertions that methods were "novel" and "improve[d] the technology

used in electronic communications" were "conclusory legal assertions which the district court was 'not bound to accept as true.'" (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Island may have deemed its own methods "inventive" and "unconventional," but it has failed to and cannot point out anything within the Asserted Patents to support such conclusory assertions.

The *Stonecastle* court found that these and related concepts did not contain any inventive concept. There, the Court found that although Island "trumpet[ed] the patents' 'sol[ution to] difficult technological problems . . . with a very particular detailed solution of how to do it, using a detailed, practical combination of steps explained through multiple embodiments,'" Island actually "never identifie[d]—nor [did] the patents make manifest—what 'difficult technological problem' they solve, or what inventive concept their 'practical combination of steps' offers." *Stonecastle*, 463 F. Supp. 3d at 498. Rather, Island "point[ed] only to the fact of practical steps"— but, the Court held, "spelling out what was inherent in the abstract idea itself is not an inventive concept within the meaning of *Mayo/Alice*." *Id.*; *see also id.* at 499 (finding Island's arguments related to efficiency and speed related to computerization to be "merely a verbose recitation of otherwise quotidian and manually executable bookkeeping practices.").

Nothing in the Asserted Patents discloses any inventive concept sufficient to rescue the claims from ineligibility. Accordingly, Island's Asserted Patents—just like the related patents found ineligible in *Stonecastle*—are directed to ineligible subject matter.

### D.    Prior Litigation Does Not Change the Ineligibility of the Asserted Patents under § 101

Island's Complaint alleges that in 2012, the Southern District of New York "rejected a patent eligibility challenge to the '551 Patent and the '286 Patent." Dkt. 1 ¶ 64; *see also Island Intellectual Property LLC v. Deutsche Bank A.G.*, 2012 WL 386282, at *7 (S.D.N.Y. Feb. 6,

2012).[1] In that case, the court found that the claims of the '551 and '286 patents "disclose[d] and claim[ed] practical methods for applying the known principles that interest rates can be tiered and limits on FDIC insured accounts can be avoided" but held that these claims were not susceptible to a summary judgment motion on § 101 grounds. *Id.* at *9. This decision, however, was issued *before Alice* and relied on the judge's conclusion that the claims were "most analogous" to those in *Ultramercial LLC v. Hulu, LLC*, 657 F.3d 1323 (Fed. Cir. 2011). *Id*. at *7. Although the claims in *Ultramercial* were initially found to be patent-eligible, they were eventually found invalid under § 101 by the Federal Circuit during a remand after the Supreme Court's decision in *Alice* was issued. *Ultramercial*, *Inc. v. Hulu, LLC*, 772 F.3d 709, 713, 717 (Fed. Cir. 2014). On remand, the Federal Circuit found that the *Ultramercial* claims were directed to the "abstract idea of showing an advertisement before delivering free content" by implementing the idea over the internet with "routine, conventional activity." *Id*. at 715-16. Thus, the fact that the *Deutsche Bank* court found certain claims of the '551 and '286 patents comparable to the claims in *Ultramercial*—claims that were ultimately found patent-ineligible under § 101—*supports* the finding that those patents, and the related Asserted Patents, are patent ineligible under § 101. Indeed, earlier this year, Island's arguments based on *Deutsche Bank* were rejected by the Southern District of New York and several patents related to the Asserted Patents were found invalid under § 101. *Stonecastle*, 463 F. Supp. 3d at 497, n.1 ("[The Judge's] decision describing the predecessor patent as 'most analogous' to a now-ineligible patent does not move the needle in Island's favor; at most, by

---

[1] The Complaint also alleges that "all of the [Asserted Patents] were adjudicated to be valid, enforceable, and patent-eligible by consent judgment in *Reich & Tang Deposit Solutions, LLC et al v. Island Intellectual Property LLC et al*, No. 16-cv-01087-GMS (D. Del. 7, 2017). Dkt. 1 at ¶ 63. However, a judge's assent to a consent judgment "indicates no more than his 'minimal determination' that the private settlement agreement 'is appropriate to be accorded the status of a judicially enforceable decree.'" *Stonecastle*, 463 F. Supp. 3d at 498 (rejecting the same "consent judgment" argument brought by Island on its related patents).

negative implication, it nudges it toward [Defendant].”). The same applies here, and the Asserted

Patents should be found in ineligible under § 101, and the Complaint dismissed.

## V.    CONCLUSION

For these reasons, Defendants respectfully request that the Court grant its motion and

dismiss Island’s Complaint for failure to plausibly state a claim for relief.


Dated: September 30, 2021                    Respectfully submitted,


                                             By: */s/ Janis E. Clements*
                                                 Janis E. Clements
                                                 Texas Bar No. 04365500
                                                 GREENBERG TRAURIG, LLP
                                                 300 West 6th Street
                                                 Suite 2050
                                                 Austin, TX 78701
                                                 Telephone: (512) 320-7232
                                                 Facsimile: (512) 320-7210
                                                 Email: clementsj@gtlaw.com

                                                 Scott J. Bornstein
                                                 Email: bornsteins@gtlaw.com
                                                 Rose Cordero Prey
                                                 Email: preyr@gtlaw.com
                                                 Vimal M. Kapadia
                                                 Email: kapadiav@gtlaw.com
                                                 Kathryn E. Albanese
                                                 Email: albanesek@gtlaw.com
                                                 GREENBERG TRAURIG, LLP
                                                 MetLife Building
                                                 200 Park Avenue
                                                 New York, NY 10166
                                                 Telephone: (212) 801-9200
                                                 Facsimile: (212) 801-6400

                                                 ***Attorneys for Defendants TD Ameritrade,
                                                 Inc., TD Ameritrade Clearing, Inc., TD
                                                 Ameritrade Trust Company, TD
                                                 Ameritrade Holding Corp., and the
                                                 Charles Schwab Corporation***

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 30th day of September 2021, I caused the above

**DEFENDANT'S MOTION TO DISMISS THE COMPLAINT FOR FAILURE TO STATE**

**A CLAIM UNDER FED. R. CIV. P. 12(b)(6)** to be electronically filed with the Court and that

counsel of record, who are deemed to have consented to electronic service in the above-referenced

case, are being served via the Court's CM/ECF System.


                                        /s/ *Janis E. Clements*
                                        Janis E. Clements