**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | |
|---|---|
| ISLAND INTELLECTUAL PROPERTY, LLC<br><br>Plaintiff,<br><br>    v.<br><br>TD AMERITRADE, INC.; TD AMERITRADE CLEARING, INC.; TD AMERITRADE TRUST COMPANY; TD AMERITRADE HOLDING CORP.; and THE CHARLES SCHWAB CORPORATION,<br><br>    Defendants. | Civil Action No. 2:21-cv-273<br><br>**JURY TRIAL DEMANDED** |

**PLAINTIFF ISLAND INTELLECTUAL PROPERTY LLC'S
<u>OPENING CLAIM CONSTRUCTION BRIEF</u>**

# TABLE OF CONTENTS

I.      INTRODUCTION ........................................................................................... 1

II.     CLAIM CONSTRUCTION AND INDEFINITENESS PRINCIPLES ............................ 2

III.    PARTIES' RESPECTIVE POSITIONS ON POSITA ........................................ 3

IV.     DISPUTED TERMS ...................................................................................... 4

        a.      "banking institution" ................................................................... 4

        b.      "participating in a program" ..................................................... 8

        c.      "on a regular basis" ................................................................. 13

        d.      "aggregated deposit account" ................................................ 15

        e.      "electronic database" .............................................................. 18

V.      CONCLUSION ........................................................................................... 22

# TABLE OF AUTHORITIES

**Cases**

*01 Communique Laboratory, Inc. v. LogMeIn, Inc.*,
  687 F.3d 1292 (Fed. Cir. 2012)..................................................................................... 18

*Atmel Corp. v. Information Storage Devices, Inc.*,
  198 F.3d 1374 (Fed. Cir. 1999).................................................................................. 2, 3

*Baldwin Graphic Systems, Inc. v. Siebert, Inc.*,
  512 F.3d 1338 (Fed. Cir. 2008)..................................................................................... 18

*Blitzsafe Texas LLC v. Mitsubishi Motors Corp.*,
  2019 WL 2212646 (E.D. Tex. May 22, 2019)........................................................ 17

*Board of Regents of the University of Texas System v. BENQ America Corp.*,
  533 F.3d 1362 (Fed. Cir. 2008)....................................................................................... 6

*CAE Screenplates, Inc. v. Heinrich Fiedler Gmbh & Co.*,
  224 F.3d 1308 (Fed. Cir. 2000)....................................................................................... 6

*Convolve, Inc. v. Compaq Computer Corp.*,
  812 F.3d 1313 (Fed. Cir. 2016)..................................................................................... 19

*Cooper Technologies v. Thomas Betts Corp.*,
  2008 WL 438339 (E.D. Tex. 2008) ........................................................................... 19

*DeBlasio v. Merrill Lynch & Co., Inc.*,
  2009 WL 2242605 (S.D.N.Y. July 27, 2009) ......................................................... 13

*Georgia-Pacific Corp. v. U.S. Gypsum Co.*,
  195 F.3d 1322 (Fed. Cir. 1999) (Fed. Cir. 2000).................................................. 20

*Intell. Ventures II, LLC v. AT & T Corp.*,
  2015 WL 4138590 (W.D. Tex. 2015)..................................................................... 8, 22

*JVW Enters. v. Interact Accessories, Inc.*,
  424 F.3d 1324 (Fed. Cir. 2005)....................................................................................... 2

*Lucent Techs., Inc. v. Gateway, Inc.*,
  525 F.3d 1200 (Fed. Cir. 2008)....................................................................................... 6

*Markman v. Westview Instruments, Inc.*,
  517 U.S. 370 (1996)............................................................................................................. 2

*Nanoco Technologies Ltd. v. Samsung Electronics Co., Ltd.*,
2021 WL 1890453 (E.D. Tex. 2021) ................................................................ 8

*Nature Simulation Systems Inc. v. Autodesk, Inc.*,
23 F.4th 1334 (Fed. Cir. 2022) ....................................................................... 2

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
572 U.S. 898 (2014) ......................................................................................... 2

*O2 Micro International v. Beyond Innovation Technology*,
521 F.3d 1351 (Fed. Cir. 2008) ..................................................................... 14

*Omega Engineering, Inc. v. Raytek Corp.*,
334 F.3d 1314 (Fed. Cir. 2003) ................................................................ 2, 16

*PC Connector Sols. LLC v. SmartDisk Corp.*,
406 F.3d 1359 (Fed. Cir. 2005) ..................................................................... 20

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) ................................................................ 2, 17

*Rembrandt Wireless Techs., LP v. Apple Inc.*,
2020 WL 248787 (E.D. Tex. Jan. 15, 2020) .................................................. 5

*SanDisk Corp. v. Kingston Technology Co., Inc.*,
695 F.3d 1348 (Fed. Cir. 2012) ..................................................................... 18

*Scanner Techs. v. Vision Sys.*,
365 F.3d 1299 (Fed. Cir. 2004) ..................................................................... 19

*SimpleAir, Inc. v. Sony Ericsson Mobile Communications AB*,
820 F.3d 419 (Fed. Cir. 2016) ......................................................................... 6

*Tate Access Floors, Inc. v. Maxcess Techs., Inc.*,
222 F.3d 958 (Fed. Cir. 2000) ....................................................................... 14

*Teleflex, Inc. v. Ficosa N. Am. Corp.*,
299 F.3d 1313 (Fed. Cir. 2002) ....................................................................... 2

*Thorner v. Sony Computer Entertainment America LLC*,
669 F.3d 1362 (Fed Cir. 2012) ........................................................................ 2

*Trading Techs. International, Inc. v. eSpeed, Inc.*,
595 F.3d 1340 (Fed. Cir. 2020) ..................................................................... 14

*Traxcell Techs., LLC v. AT&T, Inc.*,
  2019 WL 1614726 (E.D. Tex. Apr. 15, 2019) ........................................................... 10, 13, 17

*UltimatePointer, L.L.C. v. Nintendo Co., Ltd.*,
  816 F.3d 816 (Fed. Cir. 2016) ................................................................................. 13

*Whistler Corp. v. Autotronics, Inc.*,
  1988 WL 212501 (N.D. Tex. 1988) ........................................................................... 7

## Statutory Authorities

12 U.S.C. § 1813 ............................................................................................................ 6

12 U.S.C. §§ 1841 .......................................................................................................... 7

12 U.S.C. § 1843 ............................................................................................................ 7

35 U.S.C. § 282 ............................................................................................................. 2

## I.    <u>**INTRODUCTION**</u>

By this action, plaintiff Island Intellectual Property LLC ("Island") asserts that defendants TD Ameritrade, Inc., TD Ameritrade Clearing, Inc., TD Ameritrade Trust Company, TD Ameritrade Holding Corp. (which assumed the liabilities for Scottrade Financial Services, Inc. ("Scottrade")), and The Charles Schwab Corporation (collectively, "Defendants") have offered products and services that practice inventions claimed in five of Island's patents, U.S. Patent Nos. 7,519,551 ("the '551 Patent); 7,933,821 ("the '821 Patent"); 8,311,916 ("the '916 Patent"); 7,509,286 ("the '286 Patent"); and 7,680,734 ("the '734 Patent") (collectively, "Patents-in-Suit"). The Patents-in-Suit disclose technological solutions to technological problems relating to "computerized banking techniques" ('551, '821 and '916 Patents), "computerized account management techniques" ('286 Patent), and "account transaction processing" systems ('734 Patent).  Each one demonstrates, through detailed steps, how to add important functionality that had proven too cumbersome for prior art systems.  Doc. 1, Compl. ¶¶ 27-60.

In a November 4, 2021 letter to the Court, Defendants assured this Court that: "the claims of the [Patents-in-Suit] recite nothing but ***generic banking terms used in their ordinary sense, which do not require any construction***." Doc. 39-1.  Just a few months later, Defendants have changed their tune.  There are now five claim terms in dispute.  For two of those "generic banking terms used in their ordinary sense" ("program" and "on a regular basis"), Defendants claim indefiniteness.  For two others ("electronic database" and "banking institution"), Defendants seek to import limitations that are contradicted by the intrinsic evidence.  And, for a fifth claim term ("aggregated deposit account")—a term Island invented, and clearly defined in the Patents-in-Suit and their prosecution history—Defendants seek to disregard that definition in favor of a supposed "plain and ordinary meaning" that does not exist (and in fact would contradict the basis on which claims were allowed).  Their positions should be rejected.

## II.  CLAIM CONSTRUCTION AND INDEFINITENESS PRINCIPLES

Claim construction is a question of law. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 390–91 (1996).  The "claim construction inquiry . . . begins and ends in all cases with the actual words of the claim." *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1324 (Fed. Cir. 2002).  Indeed, "the claims themselves provide substantial guidance as to the meaning of [] terms." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005).  "There are only two exceptions" in which claim terms are not given their full ordinary and customary meaning: "1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of a claim term either in the specification or during prosecution." *Thorner v. Sony Computer Entertainment America LLC*, 669 F.3d 1362, 1365 (Fed Cir. 2012).  Absent these exceptions, courts "do not import limitations into claims from examples or embodiments appearing only in a patent's written description, even when a specification describes very specific embodiments of the invention or even describes only a single embodiment." *JVW Enters. v. Interact Accessories, Inc.*, 424 F.3d 1324, 1335 (Fed. Cir. 2005).  Similarly, a statement in a patent does not limit the claims unless the statement is a "clear and unambiguous disavowal of claim scope." *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1322–23 (Fed. Cir. 2003).

Indefiniteness, like claim construction, is a question of law.  *See Atmel Corp. v. Info. Storage Devices, Inc.*, 198 F.3d 1374, 1378 (Fed. Cir. 1999).  Specifically, "a patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014).  Because United States patents are accompanied by a presumption of validity, 35 U.S.C. § 282, invalidity must be established by clear and convincing evidence. *See Nature Simulation Systems Inc. v. Autodesk, Inc.*, 23 F.4th 1334, 1337 (Fed. Cir. 2022) (citation omitted).

III.   **PARTIES' RESPECTIVE POSITIONS ON POSITA**

Claim construction and indefiniteness are decided from the viewpoint of a person of ordinary skill in the art ("POSITA") in the field of the Patents-in-Suit[1] at the time of the invention. *See Atmel Corp. v. Info. Storage Devices, Inc.*, 198 F.3d 1374, 1378 (Fed. Cir. 1999).

Island's POSITA in the field of the Patents-in-Suit "would be a person with knowledge of financial or banking services that provide financial transactions in accordance with legal requirements, and the qualification of such an individual could be obtained by having a Bachelor's degree and working on design, implementation, development, and/or sale of such financial or banking services for at least three years."[2]  This is the same definition of a POSITA used in the *Deutsche Bank* litigation which involved three of the same Patents-in-Suit; specifically, the '551, '734 and '286 Patents.  Zatkovich Decl. ¶ 28.  (The remaining two Patents-in-Suit are continuations of the '551 Patent based on identical disclosure and covering similar subject matter).

Defendants' position differs somewhat from Island's.  Its POSITA would have "at least a bachelor's degree in business or finance with coursework that covers banking, as well as at least three years of experience in the field of computerized banking techniques, including account transaction processing" and that a "person with less education but more relevant practical experience or vice versa, depending on the nature of that experience and degree of exposure to banking regulations, could also qualify."  **Ex. 29**, Kursh Decl. ¶¶ 41-42.

Island submits that its POSITA position is more precise.  However, for present purposes, the result should be the same either way.  Island's constructions are the correct ones.

---

[1] The Patents-in-Suit are attached to the accompanying Declaration of John Dellaportas, sworn to on March 2, 2022, as **Exhibits 1-5**, respectively.  Exhibits thereto are cited throughout this brief as "**Ex.**"  Except where otherwise noted, all emphases in this brief have been added.

[2] *See* accompanying Declaration of Ivan Zatkovich in Support of Plaintiff's Claim Construction, sworn to on March 2, 2022 (cited herein as "Zatkovich Decl."), at ¶ 27.

## IV.   DISPUTED TERMS

### a.   "banking institution" ('551 Patent, claims 1, 11, 17, 17, 27, 33; '821 Patent, claim 19, '734 Patent, claims 1, 5, 8, 12)

| Island's Position | Defendants' Position |
|---|---|
| An organization which comprises at least a bank, and may include other financial institutions such as a broker dealer within its infrastructure | An institution that is chartered as a bank under the laws of the United States or any State in the United States, or that meets the definition of "bank" in 12 U.S.C. § 1813(a). |

Island's construction comes directly from the definition expressly adopted during prosecution of the application, which issued into the '551 Patent:

> … the term 'banking institution' as used in these claims is to be interpreted broadly and includes an organization *which comprises at least a bank and may include other financial institutions such as a broker dealer within its infrastructure*.

**Ex. 6**, Appl. Serial No. 10/071,053, Remarks to Second Supplemental Amendment dated 6/4/2002, at p. 14:25-15:3 (citing Specification page 2 lines 22-31, page 3 lines 20-25 ('551 Patent, col. 1, lines 23-39)), TXISL-009417 – 009436.

Consistent with this definition from the prosecution history, the preamble to Claim 1 of the '551 Patent and the '821 Patent makes clear that "client accounts" (which are the source of funds put into the claimed method) are "held in the name of the respective clients at a first banking institution".  In the specifications thereto, it is explained that the entities that may hold the client accounts "may be a bank, savings institution, brokerage firm, or other entity where financial transactions take place or can be facilitated."  **Ex. 1**, '551 Patent, Col. 8, lines 7-9, TXISL-059369-059387; **Ex. 2**, '821 Patent, Col. 8, lines 6-8, TXISL-62190-062215.  "These accounts, which may originate from a variety of sources, banks, brokerage firms, and/or clients, are held at any of a plurality of savings institutions or bank."  **Ex. 1**, '551 Patent, Col. 2, lines 1-5, TXISL-059369-059387; **Ex. 2**, '821 Patent, Col. 2, lines: 2-5, TXISL-62190-062215.

It is black-letter law that "a patentee may choose to be his own lexicographer and use terms in a manner other than their ordinary meaning, as long as the special definition of the term is clearly stated in the patent specification or file history." *Rembrandt Wireless Techs., LP v. Apple Inc.*, No. 2:19-CV-25-JRG, 2020 WL 248787, at *5 (E.D. Tex. Jan. 15, 2020) (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)). Here, the patentees have chosen to be their own lexicographer, and that choice controls the claim construction.

In opposition, Defendants propose that "***banking institution***" be construed to mean, in a nutshell, a "***bank***." The claim language reveals the absurdity of conflating these two terms. For example, Claim 1 of the '551 Patent requires, *inter alia*, that an "aggregated deposit account held in ***a different respective bank of a different respective banking institution***" and an "FDIC-insured and interest-bearing aggregated deposit account held at ***one of the banks of one of the banking institutions***." **Ex. 1**, '551 Patent, Claim 1, Col. 9, line 49-Col. 10, line 17, TXISL-059369-059387. Claims 18 and 28 of the '551 Patent and Claim 19 of the '821 Patent likewise distinguishes between a "***bank***," and a "***banking institution***", referring to "***a first banking institution that includes a first bank in its infrastructure***." **Ex. 1**, '551 Patent, Claim 27, Col. 13, line 43-Col. 14, line 14, TXISL-059369-059387; **Ex. 2**, '821 Patent, Claim 19, Col. 14, lines 13-55, TXISL-62190-062215. As explained in the aforementioned office action, the claims are intended to cover an implementation where "the client hold[s] an account with a self-clearing broker dealer that is part of the infrastructure of a ***first banking institution***," as well as where "the client placing funds with a broker dealer that is not self clearing or chooses not to self clear but is part of the infrastructure of the ***first banking institution***." **Ex. 6** at TXISL-009431-32.

In other words, the "***first banking institution***" includes not only a "***bank***," but also a "broker dealer". Defendants disagree, arguing that "***banking institution***" simply means a "***bank***".

This contravenes the intrinsic evidence, as well as the presumption that "different claim terms are presumed to have different meanings." *Board of Regents of the University of Texas System v. BENQ America Corp.*, 533 F.3d 1362 (Fed. Cir. 2008); *accord, e.g.*, *SimpleAir, Inc. v. Sony Ericsson Mobile Communications AB*, 820 F.3d 419, 431 (Fed. Cir. 2016) ("The choice to use 'data channel' in claim 1 rather than 'data feed'" notwithstanding use of the latter elsewhere in the patent, lends further support to our conclusion that 'data feed' does not carry the same meaning as 'data channel.'"); *CAE Screenplates, Inc. v. Heinrich Fiedler Gmbh & Co.*, 224 F.3d 1308, 1317 (Fed. Cir. 2000) ("In the absence of any evidence to the contrary, we must presume that the use of these different terms in the claims connotes different meanings.").

By insisting that a "banking institution" can include nothing other than a "bank" within its infrastructure, Defendants would also have this Court interpret the claim term "include" to be close-ended.  This, too, is incorrect as a matter of claim construction law.  *See Lucent Techs., Inc. v. Gateway, Inc.*, 525 F.3d 1200, 1214 (Fed. Cir. 2008) ("This court has consistently interpreted 'including' and 'comprising' to have the same meaning, namely, that the listed elements (i.e., method steps) are essential but other elements may be added.").

In support of their effort to overcome these presumptions, Defendants offer a quasi-legal opinion from Steven Kursh (who is not a lawyer).  Dr. Kursh contends that "***banking institution***" should be read to mean "***bank***" as defined in a federal statute not referenced in the any of the Patents-in-Suit, 12 U.S.C. § 1813(a).  This contention makes no sense, as the definition does not include an organization that can own a broker-dealer (or some other source institution as noted in the specification and prosecution history) alongside one or more banks.

That is not because no relevant statutory definition exists.  Rather, as the materials appended to Dr. Kursh's own declaration make clear, the Gramm-Leach-Bliley Act of 1999

repealed the Glass-Steagall Act of 1933 and authorized a subset of "bank holding company" called a "financial holding company" that owns banks to also own "broker-dealers engaged in securities underwriting and dealing."  **Ex. 29**, Kursh Decl. ¶ 54 (citing 12 U.S.C. §§ 1841(p), 1843(l)(1)). The statutory definition of "financial holding company" matches "banking institution" as used in the Patents-in-Suit under the construction proposed by Island.[3]

All this was new information to Defendants' claim construction expert, Dr. Kursh, who, at his deposition, acknowledged his lack of knowledge of "financial holding companies," despite their being referenced in his own submission. **Ex. 7**, Kursh Tr. 77:25-78:19.  They certainly are not new, however, to Defendants' themselves.  TD Ameritrade (a broker dealer), with its then-affiliate banks (TD Bank, N.A. and TD Bank USA, N.A.), participated in the infringing "Sweep Program" that held the aggregated deposit accounts within the TD Ameritrade infrastructure. **Ex. 8**, January 19, 2016 TD Ameritrade Client Agreement, p. 1, 4-5, TDACS_004762-4772; *see also* **Ex. 9**, Amdnt. No. 1 to Insured Deposit Account Agreement dated October 24, 2016, p. 2, TDACS_004773-4778 (causing "Scottrade to perform the functions contemplated by Section 1 of the [2013 TD Ameritrade] IDA Agreement … on the same terms and subject to the same conditions" as TD Ameritrade).  That should not surprise the Court.  As the Complaint lays out in detail, Defendants learned and copied the invention directly from Island.

---

[3]  This was not by accident. When the first application for the earliest Patent-in-Suit was filed in late 1998, Congress was already well underway to considering the repeal of Glass-Steagall's prohibition against bank ownership of brokerages. *See* **Ex. 10**, "Finance Reform Will Pick Up Again Next Year," *Journal of Accountancy*, Dec. 31, 1997 (1997 article predicting repeal of Glass-Steagall); **Ex. 11**, "Struggling with Sweep Accounts," America's Community Banker, Vol. 6, No. 12, 11 Sheets, December 1, 1997 (noting "legal barriers dating from the 1930s, the resultant regulatory restrains and operational inefficiencies dramatize the need to first 'sweep away' the outdated barriers and unnecessary restraints."). The inventions were designed in part to address technological issues associated with these anticipated future regulatory developments, an objective is entire permissible under patent law. *See, e.g.*, *Whistler Corp. v. Autotronics, Inc.*, 1988 WL 212501, *1 (N.D. Tex. 1988) (rejecting infringer's argument that use of invention was illegal and therefore lacked patentable utility).  Moreover, and in any event, the priority date for the '551 and '821 Patents is February 8, 2002, which is after Glass-Steagall was overturned.

### b. "participating in a program" ('916 Patent, claim 1; '286 Patent, claim 1)

| Island's Position | Defendants' Position |
|---|---|
| Plain and ordinary meaning | Indefinite |

The phrase "participating in a program" / "in a program" appears in both Claim 1 of the '916 Patent and Claim 1 of the '286 Patent. Defendants argue that "participating in a program" is indefinite because the word "program" can refer either to a computer program or to a financial institution offering. However, as this Court and others have recognized, "just because a term has multiple definitions does not, by itself, mean that the term is indefinite. Indefiniteness does not require absolute certainty, but only reasonable certainty around the boundaries of the term." *Nanoco Technologies Ltd. v. Samsung Electronics Co., Ltd.,* 2021 WL 1890453, *8 (E.D. Tex. 2021); *accord, e.g.*, *Intell. Ventures II, LLC v. AT & T Corp.,* 2015 WL 4138590, **16-17 (W.D. Tex. 2015) (rejecting "multiple-meaning argument" where ambiguity would only arise through a "tortured reading"). In this instance, Defendants' indefiniteness argument fails on its face because it wholly ignores the context in which the term "program" is used throughout the asserted claims, the prosecution history, and the cited art.

Claim 1 of the '916 Patent sets forth a method of computerized deposit sweep product whereby funds of the clients' accounts are allocated in accordance with specific allocation steps among "***a plurality of financial institutions participating in a program***", comprising:

> (A) accessing, using one or more computers, one or more electronic databases, stored on one or more computers-readable media, the one or more databases comprising:

> (1) aggregated account information for a plurality of government backed-insured and interest-bearing aggregated deposit accounts ***held in a plurality of financial institutions participating in a program*** including a first depository institution in infrastructure of a first financial institution of the plurality of the financial institutions and a second depository institution in infrastructure of a different financial institution of the plurality of the financial institutions, wherein

funds from client accounts of a plurality of clients are aggregated with funds of other client accounts in the aggregated deposit accounts held in the financial institutions, with the aggregated deposit accounts providing non-penalized liquidity for the funds held therein;

(2) client account information for funds, for each of a plurality of respective client accounts, held in one or more of the plurality of the financial institutions, with funds accepted for deposit for respective ones of the clients accounts in the names of the respective clients at the first financial institution, with the client account information comprising a respective balance of funds, from the respective client account, held in each of one or more of the aggregated deposit accounts holding funds of the respective client account; and

(B) allocating, using the one or more computers, for multiple of the client accounts, the client funds of these respective client accounts among more than one of aggregated deposit accounts, so that at least a portion of these client funds are maintained in the aggregated deposit account in the first depository institution and at least a portion of the client funds are maintained in the aggregated deposit account held in the second depository institution in the different financial institution;

(C) determining, using the one or more computers, client funds to be withdrawn from the aggregated deposit account held at one of the depository institutions of one of the financial institutions more than six (6) times during a month while preserving an insured and interest-bearing status of the aggregated deposit account held at the one depository institution;

(D) generating one or more instructions to transfer funds to or from one or more of the respective aggregated deposit accounts in the respective depository institutions in the program through an aggregated demand deposit account based at least in part on the respective allocations determined for the respective depository institutions in the program, wherein the one or more instructions comprise making a withdrawal and/or transfer from the one aggregated deposit account more than six (6) times during the month period to correspond at least with the more than six (6) of the allocations determined over the month period that are withdrawals, while maintaining an insured and interest-bearing status of the aggregated deposit account held at the one depository institution; and

(E) updating or having updated, using the one or more computers, the one or more electronic databases based at least in part on the allocation of client funds to or from the plurality of aggregated deposit accounts.

**Ex. 3**, '916 Patent, Claim 1, Cols. 9-10, lines 53-51, TXISL-062216-062241.

Similarly, Claim 1 of the '286 Patent sets forth a method of computerized deposit sweep product whereby interest of clients' accounts is allocated in accordance with the interest-allocation procedure among "***a plurality of financial institutions participating in a program***." **Ex. 4**, '286 Patent, Claim 1, Col. 27, lines 9-65, TXISL-059388-059424.

To a POSITA, there is nothing remotely vague or confusing about what "***program***" means in the context of these claims.  "To determine the meaning of the claims, courts start by considering the intrinsic evidence," including "the claims themselves, the specification, and the prosecution history."  *Traxcell Techs., LLC v. AT&T, Inc.*, 2019 WL 1614726, *6 (E.D. Tex. Apr. 15, 2019) Here, to the extent the claims are not already clear, the prosecution histories are replete with examples of "Programs" by a wide variety of financial institutions, including the Federal Reserve, Smith Barney, Deutsche Bank, Dreyfus, First Southwest Company, among others, that have a plurality of financial institutions participating in their respective programs:

- Anderson et al. "Retail Sweep ***Programs*** and Bank Reserves," Federal Reserve Bank of St. Louis Review, Bell & Howell Information and Learning Company, vol. 83, Issue 1, 24 Sheets, Jan. 1, 2001.  **Ex. 12** ('286 Patent Prosecution History) at TXISL-010124-010147;
- Bank Deposit ***Program***, Online http://web.archive.org/web/20030620100115/*http:/www.smithbarney.com/products_s ervi*, Jan. 19, 2001, 4 Sheets. **Ex. 12** ('286 Patent Prosecution History) at TXISL-010625-010628;
- Bank insured agency deposit account ***program*** custodial account agreement, Evolve Bank & Trust, 8 pgs. **Ex. 13** ('916 Patent Prosecution History) at TXISL-072245;
- Bank Insured Deposit ***Program***, D.A. Davidson & Co., Jan. 15, 2010, 2 sheets. **Ex. 13** ('916 Patent Prosecution History) at TXISL-72438;
- Bank Insured Deposit ***Program***, D.A. Davidson & Co., Nov. 2, 2009, 2 sheets. **Ex. 13** ('916 Patent Prosecution History) at TXISL-72438;
- D.A. Davison & Co., Bank Insured Deposit ***Program***, Disclosure Statement, Jan. 15, 2010, 4 sheets.  **Ex. 13** ('916 Patent Prosecution History) at TXISL-72239;
- DB Advisors, Deutsche Bank Group, Insured Deposit ***Program***, 1 sheet. **Ex. 13** ('916 Patent Prosecution History) at TXISL-72248;
- Deutsche Bank Alex. Brown insured deposit ***program*** (IDP), Dec. 1, 2009, 10 pgs.
- Deutsche Bank Insured Deposit ***Program***, Marketing Literature 2007, 3 pages. **Ex. 13** ('916 Patent Prosecution History) at TXISL-72217;
- Dreyfus Insured Deposit ***Program*** Disclosure Statement and Terms and Conditions,

received Mar. 2008, 12 pages. **Ex. 13** ('916 Patent Prosecution History) at TXISL-72257;

- Dreyfus Insured Deposit *Program*, Disclosure Statement and Terms and Conditions, Dreyfus A BNY Mellon Company, Jan. 2008, 8 Sheets. **Ex. 13** ('916 Patent Prosecution History) at TXISL-72217;
- Dreyfus Insured Deposit *Program*, Multiple List Program—Effective May 11, 2009, 1 Sheet. **Ex. 13** ('916 Patent Prosecution History) at TXISL-72217;
- Federally "Insured Deposit *Program*", AmVest Capital, 1 sheet. **Ex. 13** ('916 Patent Prosecution History) at TXISL-72437;
- Federally Insured Deposit *Program* for Banks, AmVest capital, Jan. 15, 2010, 2 sheets. **Ex. 13** ('916 Patent Prosecution History) at TXISL-72437;
- First City, Texas Insured Savings Agency Agreement with Exhibits A-B and Insured Savings *Program*, 10 pgs. **Ex. 13** ('916 Patent Prosecution History) at TXISL-72431;
- First Southwest Company, First Southwest Company Bank Insured Deposit *Program*, Sep. 28, 2009, 11 pgs. **Ex. 13** ('916 Patent Prosecution History) at TXISL-72239;
- Flow of Business for Federally Insured Deposit *Program* "FIDP", Deutsche Bank & Trust Company of the Americas, 1 sheet. **Ex. 13** ('916 Patent Prosecution History) at TXISL-72238;
- Frequent Asked Questions: FDIC Sweep *Program*, optionsXpress, www.optionsxpress.com/welcom/faq/aq/fdc.aspx#rate. **Ex. 13** ('916 Patent Prosecution History) at TXISL-72441;
- Frequently Asked Questions for the LYRA *Program*, H.C. Denison Co., Jan. 15, 2010, 3 pgs. **Ex. 13** ('916 Patent Prosecution History) at TXISL- 72440;
- Frequently asked questions, Evolve Bank & Trust, www.insureddepositsonline.com/content/view/38/120/, Jan. 15, 2010, 3 pgs. **Ex. 13** ('916 Patent Prosecution History) at TXISL-72244;
- Frequently Asked Questions: FDIC Sweep *Program*, optionsXpress, www.optionsxpress.com/welcom/faq/fdic.aspx, Jan. 6, 2010, 3 pgs. **Ex. 13** ('916 Patent Prosecution History) at TXISL-72242;
- Frequently Asked Questions: FDIC Sweep *Program* www.optionsxpress.com/welcom/faq/fdic.aspx, Nov. 12, 2009, 2 sheets. **Ex. 13** ('916 Patent Prosecution History) at TXISL-72242;
- How the *program* works, Insured Deposit *Program*, Evolve Bank & Trust, www.insureddepositsonline.com/content/view/47/112/, Jan. 15, 2010, 1 sheet. **Ex. 13** ('916 Patent Prosecution History) at TXISL-72245; and
- How the *program* works, Insured deposit *program*, Evolve Bank & Trust, www.insureddepositsonline.com/content/view/47/112/, Nov. 4, 2009, 11 pgs. **Ex. 13** ('916 Patent Prosecution History) at TXISL-72245.

Indeed, ***Defendants themselves regularly use "program" to mean the same thing***, without explanation**,** assuming correctly that their readers will know exactly to what they are referring. For example, Scottrade described the accused product offering as follows:



**Scottrade - Bank Deposit Program**
**Terms, Conditions & Disclosures**

The Scottrade Bank Deposit Program ("BDP") seeks to provide you with the security of FDIC insurance for your cash balances. By utilizing multiple banks, the BDP has been structured to provide you with up to $1,000,000 in FDIC insured deposits as set forth below. Through the BDP, excess cash balances in your eligible Scottrade brokerage account will automatically be deposited into interest-bearing FDIC-insured accounts ("BDP Account") at one or more banks ("Program Banks").Your fund balance in each BDP Account, individually and aggregated, is referred to as your "Customer Deposit Account." One of the Program Banks in the BDP will be Scottrade Bank FSB ("Scottrade Bank"), an affiliate of Scottrade, Inc. ("Scottrade").

**Ex. 14**, Scottrade Bank Deposit *Program*—Terms, Conditions & Disclosures; (dated 8-11), pp. 1-3, TXISL-022464-22466; *see also, e.g.*, **Ex. 15**, 06-2017 Scottrade Brokerage Account Agreement p. 3, TDACS_00004675-4688 ("Scottrade Sweep Program").

Likewise, TD Ameritrade also uses the term "***program***" to describe its "Sweep Program" as part of its brokerage offerings in its client agreements:

> j. **Sweep Program.** My available cash may be swept into a sweep vehicle pending investment of the cash. The alternatives available under **the Sweep Program** are referred to as "Sweep Choices," and the one I select is referred to as the "Designated Sweep Vehicle." You will notify me of the Sweep Choices and the Designated Sweep Vehicle. I agree that at account opening my Designated Sweep Vehicle will be the TD Ameritrade FDIC Insured Deposit Account (described below), unless I select a different Sweep Choice.

**Ex. 8**, January 19, 2016 TD Ameritrade Client Agreement, p.4 par. 8(j) "Sweep Program", TDACS_00004762- 4772; *see also, e.g.,* **Ex. 16**, Sept. 2021 TD Ameritrade Client Agreement, p. 8(j) "Cash Features Program", TDACS_00005499-5507.

Nor is there anything inherently confusing about the word "program" itself.  Defendants' own expert uses the word three times in a single paragraph of his bio to mean three different things, without attaching a glossary.  **Ex. 29**, Kursh Decl. ¶ 16 ("I was in the Honors *Program* … my major course work … were in Housing and Real Estate in the Urban Planning *program*, … and … I took courses … that required extensive use of computers including writing software *programs*."). Rather, he properly trusts the reader to understand the meaning of the word from the context.

Subsequent to the issuance of the Patents-in-Suit, the term "program" as it applies to a sweep or insured deposit program continues to be a common term in the deposit sweep and insured deposit industry to refer to the financial product offering in which various entities (*e.g.*, a plurality of financial institutions) can participate that is governed by a common set of rules (*e.g.*, the specific asset allocation process set forth in claim 1 of the '916 Patent or the specific interest-allocation procedure set forth in claim 1 of the '286 Patent).  *See, e.g.*, *DeBlasio v. Merrill Lynch & Co., Inc.*, 2009 WL 2242605, *1 (S.D.N.Y. July 27, 2009) (dismissing putative class action brought against five groups of banking entities, including Charles Schwab, relating to a series of "Cash Sweep Programs" offered as part of their respective customer brokerage accounts).  As such, this Court should rely upon the term's plain and ordinary meaning.

c.      **"on a regular basis" ('734 Patent, claims 1, 8)**

| Plaintiff's Position | Defendants' Position |
| --- | --- |
| Regularly; occurring in regular time intervals or patterns, *e.g.* daily, weekly, monthly, on a business day | Indefinite |

Everyone, not just a POSITA, knows the meaning of the phrase "***on a regular basis***".  *See Traxcell Techs.*, 2019 WL 1614726, *6 ("[t]he general rule … is that each claim term is construed according to its ordinary and accustomed meaning as understood by one of ordinary skill in the art at the time of the invention in the context of the patent").

Nevertheless, Defendants argue that the term is somehow indefinite, because the '734 Patent specification also refers to "on a regular ***periodic*** basis" (**Ex. 5**, '734 Patent, Col. 2, lines 19-37), "on a regular ***periodic*** basis (e.g., daily)" (**Ex. 5**, '734 Patent, Col. 3, lines 30-33) and "regularly (***preferably daily***)."  That argument is incorrect, as it is premised on importing a limitation from the specification into the claim itself.  *See UltimatePointer, L.L.C. v. Nintendo Co., Ltd.*, 816 F.3d 816, 822 (Fed. Cir. 2016) ("We have cautioned against importing limitations from

the specification into the claims when performing claim construction"); *Tate Access Floors, Inc. v. Maxcess Techs., Inc.*, 222 F.3d 958, 966 (Fed. Cir. 2000) ("Although the specification may well indicate that certain embodiments are preferred, particular embodiments appearing in the specification will not be read into the claims when the claim language is broader than such embodiments.") (citation omitted).  Even "when the specification uses a single embodiment to enable the claims, courts should not limit the broader claim language to that embodiment ***unless the patentee has demonstrated a clear intention to limit the claim scope*** using 'words or expressions of manifest execution or restriction.'"  *Trading Techs. Int'l, Inc. v. eSpeed, Inc.*, 595 F.3d 1340, 1352 (Fed. Cir. 2020) (citation omitted).

Defendants cannot point to any such "clear intention" here.  In the absence thereof, a POSITA would understand "on a regular basis" in the context of claims 1 and 8 of the '734 Patent to mean, consistent with its plain and ordinary meaning, "Regularly, occurring in regular time intervals or patterns."  *See* **Ex. 17**, YourDictionary, https://www.yourdictionary.com/on-a-regular-basis (last viewed January 10, 2022), TXISL-062123.  The fact that the specification provides a subset of regular basis as including only "periodic" does not mean that other forms of regular basis (e.g., based on a pattern) is vague, confusing or indefinite.  *See O2 Micro Int'l v. Beyond Innovation Tech.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008) ("[D]istrict courts are not (and should not be) required to construe every limitation present in a patent's asserted claims.").

As Island's claim construction expert, Ivan Zatkovich, explains, a POSITA would understand that a "on a regular basis" as used in the context of the '734 Patent claims includes not only on a "periodic" time intervals, like daily, weekly or monthly, but also based on a "pattern", *e.g.*, on a business day, or the first day of the month.  In the context of the daily sweeps, a POSITA would understand that such a pattern could be every business day (as was a common timing for

determining "net transactions" for sweep products when this claim was first presented in 2002).

Zatkovich Decl. ¶ 80.  An illustration of such a "pattern" that would be "on a regular basis" can be found in TD Ameritrade Client Agreements that define "business day" as "Monday through Friday, excluding market holidays."  *See, e.g.*, **Ex. 18**, Sept. 1, 2017 TD Ameritrade Client Agreement, p. 1, TDACS_00004783-4792.  While this is "on a regular basis" and being conducted "regularly" it is not necessarily "periodic" since it excludes market holidays.

In sum, there is nothing remotely vague or confusing about the phrase "on a regular basis".

The Court should adopt that claim term's plain and ordinary meaning.

> **d.** **"aggregated deposit account" ('551 Patent, claims 1, 6, 11, 17, 18 23, 27, 33; '821 Patent, claims 19, 21, 23; '916 Patent, claims 1, 2, 5, 6, 8, 13; '286 Patent, claim 1; '734 Patent, claims 1, 5, 8, 12, 15, 16)**

| Plaintiff's Position | Defendants' Position |
|---|---|
| A deposit account which holds funds for a plurality of different clients and not multiple accounts of the same client being aggregated | Plain and ordinary meaning |

The parties dispute whether the term "aggregated deposit account" should be construed as a deposit account which holds funds for a plurality of *different clients* or whether it also refers to multiple accounts of the *same client* being aggregated.  Defendants, ignoring the prosecution history, the plain language of the asserted claims, and the prior adoption of a nearly identical construction in a related litigation, contend that the latter construction (*i.e.,* multiple accounts of the same client being aggregated) is the "plain and ordinary meaning."

It is not.  Tellingly, Defendants' expert could not point to a single instance, anywhere, ever, in which the term has been used to mean what they now say it means.  **Ex. 7**, Kursh Tr. 99:5-105:7.

That is because it is a coined term the inventors created for this specific purpose.

In contrast to Defendants' proposed construction, Island's proposed construction of "aggregated deposit account" as "a deposit account which holds funds for a plurality of different

clients, and not multiple accounts of the same client being aggregated" is expressly found in the prosecution history of the application that issued into the '734 Patent.  There, the applicant explained that the cited prior art (The MerrillLynch CMA Savings Account Facts Sheet) did not disclose "aggregated accounts," but rather taught against them: "[t]his section … says nothing about large aggregated deposit accounts holding the funds of ***many different clients*** aggregated in the respective large aggregated accounts".  **Ex. 19**, Appl. Serial No. 10/305,439, Response to Office Action dated 11/3/2009 at p. 9:10-10:22, TXISL-012729-012749.  Thus, the claimed "aggregated deposit account" was expressly distinguished in the prosecution history from "aggregate[ing]" multiple accounts of the same customer for purposes of FDIC insurance.

This is a "clear and unambiguous disavowal of claim scope," binding on future claim constructions.  *See Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1322–23 (Fed. Cir. 2003). That same disavowal carries through to the asserted claims.  For example, the term "aggregated deposit account" as used in claim 1 of the '286 Patent makes clear that "each aggregated deposit account holds funds of ***a plurality of the clients***" meaning different clients.  **Ex. 4**, '286 Patent, Claim 1, Col. 27, lines 9-65, TXISL-059388-059424.  Similarly, claim 1 of the '916 Patent makes clear that "aggregated deposit account" aggregates "funds" from more than one client, where it states: "wherein funds from client accounts of ***a plurality of clients*** are aggregated with funds of other client accounts in the aggregated deposit accounts held in the financial institutions, with the aggregated deposit accounts providing non-penalized liquidity for the funds held therein".  **Ex. 3**, '916 Patent, claim 1, Cols. 9-10, lines 53-51, TXISL-62216-62241.

When asked to reconcile his support for Defendants' construction with unambiguous claim language, Defendants' expert responded that: "It's my opinion that the use of the words and the claim defines.  It is not a definition.  It uses those words but it doesn't define them."  **Ex. 7**, Kursh

Tr. 109:9-17.  This (at best) has missed the point. "It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Traxcell Techs.*, 2019 WL 1614726, *3 (quoting *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (*en banc*)).  Defendants cannot just ignore or dismiss inconvenient claim language because it undermines their proposed construction.

Moreover, Defendants' construction makes no sense in the context of these patents, given that one of their aims (as Dr. Kursh himself acknowledges) is to "obtain FDIC insured, interest-bearing accounts … with insurance that may exceed $100,000 [the FDIC limit at the time]" notwithstanding "the accompanying [statutory and] regulatory scheme."  **Ex. 29**, Kursh Decl. ¶ 39.  There is no mechanism by which a single customer can obtain more than now $250,000 (then $100,000) in FDIC insurance merely by aggregating his or her own deposit accounts, as "[t]he FDIC adds together all single accounts owned by the same to person at the same bank and insures the total up to $250,000."  **Ex. 20**, FDIC, Your Insured Deposits, last updated Oct. 14, 2021, https://www.fdic.gov/resources/deposit-insurance/brochures/insured-deposits/.  Aggregation only works in the context of multiple accounts from multiple clients.

Lastly, in Island's prior patent litigation with Deutsche Bank, the parties agreed to, and the Court adopted, a construction of "*aggregated deposit account(s)*" as "*A deposit account which combines fund from different customer to be held together.*"  **Ex. 21**, *Island IP et al. v. DBTCA & TBS*, Case No. 1:09-cv-02675-KBF, ECF No. 227-3, TXISL-022780-2786.  While that prior construction is not binding on this Court, it is "entitled to reasoned deference under the broad principals of *stare decisis* and the goals articulated by the Supreme Court in Markman, even though stare decisis may not be applicable per se." *Blitzsafe Texas LLC v. Mitsubishi Motors Corp.*, 2019 WL 2212646, *5 (E.D. Tex. May 22, 2019) (citation omitted).

- 17 -

      **e.**      **"electronic database" ('551 patent, claims 1, 11, 18, 27; '916 patent, claims 1, 6; '821 patent, claims 19, 21; '286 patent, claim 1; '734 patent, claims 1, 8, 15, 16)**

| Plaintiff's Position | Defendants' Position |
|---|---|
| "Electronically" means "using a computer or performed by a computer processor" (undisputed)<br><br>"Database" means "an organized collection of information stored in one or more computerized files" | a single [electronic] database |

The parties agree that the use of the term "electronic" or "electronically" means "using a computer or performed by a computer processor".   This definition comes from the prosecution history of the '286 Patent, in which the applicant explained that "electronically" means "performed using a computer processor."  **Ex. 22**, Appl. Serial No. 10/411,650, 5/9/2008 Response to Office Action at p. 19-15:16, TXISL-010375-010404.  In response to this statement, the Examiner in the Notice of Allowance confirmed that "electronically" means "using a computer or performed by a computer processor."  **Ex. 23**, Appl. Serial No. 10/411,650, 12/19/2008 Notice of Allowance at p. 4:9-10, TXISL-010711-010714.

Where the parties part ways is in Defendants' insistence that "a database" can only mean "a *single* database."  Their argument runs contrary to claim construction principles.  The Federal Circuit has repeatedly held that the articles "a" and "an" mean one *or more* rather than only one, in the absence of intrinsic evidence necessitating a contrary result.  *See Baldwin Graphic Systems, Inc. v. Siebert, Inc.*, 512 F.3d 1338 (Fed. Cir. 2008) ("That "a" or "an" can mean "one or more" is best described as a rule, rather than merely as a presumption or even a convention"); *SanDisk Corp. v. Kingston Technology Co., Inc.*, 695 F.3d 1348 (Fed. Cir. 2012) (holding that the district court erred in limiting "user data and overhead information" to a single user data and a single overhead portion and explaining that the intrinsic evidence did not demonstrate an intent to exclude multiple user data portions or overhead portions from the claim scope); *01 Communique*

*Laboratory, Inc. v. LogMeIn, Inc.*, 687 F.3d 1292 (Fed. Cir. 2012) ("The patent's use of words such as "a," "its," and "the" in the claims is insufficient to limit the meaning of "locator server computer" to a single physical computer); *Convolve, Inc. v. Compaq Computer Corp.*, 812 F.3d 1313, 1320–22 (Fed. Cir. 2016) (holding that the claim language "a processor" meant "one or more processors").  No such contrary extrinsic evidence exists here.

The Federal Circuit has also recognized that "the very use of the transition 'comprising' in conjunction with the indefinite article 'a' or 'an' creates the presumption that the article is construed to mean one or more elements or steps." *Scanner Techs. v. Vision Sys.*, 365 F.3d 1299, 1304 (Fed. Cir. 2004); *accord, e.g.*, *Cooper Technologies v. Thomas Betts Corp.*, 2008 WL 438339, *6 (E.D. Tex. 2008) (noting that use of indefinite article "a" in a comprising claim does not limit invention to only one "color band").  Here, the asserted claims are method claims that use the word "comprising" in conjunction with the act of maintaining or updating "an electronic database."  **Ex. 1**, '551 Patent, Claim 1, Col. 9, line 49-Col. 10, line 17; '551 Patent, Claim 11, Col. 11, lines 12-49; '551 Patent, Claim 18, Col. 12, lines 22-59; '551 Patent, Claim 27, Col. 13, line 43-Col. 14, line 14.  Accordingly, "a database" is not limited to the singular.

Defendants' only argument to the contrary is that, while the three earliest Patents-in-Suit use the indefinite article "a", the later two Patents-in-Suit use the terms "one or more electronic databases."  Defendants request that this Court construe the meaning of a claim term as of the time of the invention, by retroactively importing their requested limitation on to the earlier patents based on a non-substantive wording change in the later issued patents.  That, however, would go against the fundamental claim construction principle that even Defendants' expert himself recognized: "one should try to determine how a person of ordinary skill would understand the term in the context of the patent *as of the effective filing date, i.e., priority date, of the patent*."  **Ex. 29**, Kursh

Decl. ¶ 24; *see also PC Connector Sols. LLC v. SmartDisk Corp.*, 406 F.3d 1359, 1361–63 (Fed. Cir. 2005) ("A claim cannot have different meanings at different times; its meaning must be interpreted *as of its effective filing date*.").  For this reason, it is almost never proper to interpret an earlier issued patent based on a later, even related, patent.  *See, e.g.*, *Georgia-Pacific Corp. v. U.S. Gypsum Co.*, 195 F.3d 1322, 1332 (Fed. Cir. 1999), *opinion amended on reh'g*, 204 F.3d 1359 (Fed. Cir. 2000) (rejecting argument that a statement made in the prosecution history of a later patent application, which was made nine months *after the patent in suit issued*, applied to limit scope of term in patent at issue where the specification and prosecution history of the patent at issue were unambiguous as to the meaning of the term).

Beyond being violative of basic claim construction principles, Defendants' attempt to limit database to the singular makes no technological sense.  A database is not a singe physical device like a toaster; it is "an organized collection of information stored in one or more computerized files." **Ex. 24**, *Plant Equipment, Inc. v. Intrada, Inc*., Case No. 2:09-cv-00395-JRG, ECF 127 at 8 (E.D. Tex. Apr. 27, 2012), TXISL-061876-061902; *accord, e.g.*, **Ex. 25**, Webster's II, New Riverside University Dictionary, 1988 (defining "database" as "a collection of data arranged for ease and speed of retrieval, as by a computer") TXISL-062116-062122; **Ex. 26**, The New Oxford American Dictionary, 2001 (defining "database" as "a structured set of data held in a computer, esp. one that is accessible in various ways") TXISL-062111-062115.  The '551 Patent further indicates that an "electronic database" can also be stored on "one or more computer readable media" (*e.g.*, more than one disk drive).  *See, e.g.*, claim 11 of '551 Patent.

Thus, by its very nature, a database can be stored across multiple devices, such that there is no clear dividing line between one database and more than one database.  As Island's expert, Ivan Zatkovich, testified, a deposition can be composed of multiple databases:

… the term "database" in general within the industry can mean a single database or it could be a logical database incorporating multiple other databases . . . There's many examples in the industry where a database is created and defined and even developed a specific scheme for that accesses tables and information in other databases.

One example of that would be a distributed database. A distributed database can be constructed by linking tables from other databases into a single hierarchical database such that when you access what looks like a physical record when in fact the record is made up of data from multiple tables from multiple databases and in fact they, they develop specific technology to handle those databases. One would be, for example, a two phase commit, such that if your query that accesses a specific table within your logical database, when in fact that's made up of information from multiple tables of other databases. …

There's also the concept of an ODBC which is an online construct of allowing you to access multiple databases through a single query, and this was invented by Microsoft back in I believe the late '90s so that you can perform a query as a logical database which actually accesses multiple databases.

There's also the concept of peer to peer databases where you have individual databases that contain portions of the same type of information. And, for example, in peer to peer databases you can have identical schemas in all local databases but you can do a query from a single peer to peer database that retrieves, updates or transfers information from all the local databases using a query from a single peer to peer database.

**Ex. 27**, Zatkovich Tr. 32:12-34:25.[4]

These are basic technological facts that any POSITA would recognize. Indeed, in a prior action, Steven Kursh himself construed claim language that referred only to "a database" to mean "the database or databases." *See* **Ex. 28**, Ex. 17 to Kursh Deposition, *Westlake Services, LLC v. Credit Acceptance Corp.* His 180-degree turn in this case is not well-taken. The Court should not limit this term in the manner in which Defendants demand.

---

[4] Mr. Zatkovich has extensive experience developing database technology for the financial services industry over the past twenty years. His work includes the development of many financial applications contemporaneous with the priority date of the Patents-in-Suit. Specific notable projects include Mr. Zatkovich's role as the project manager and architect for implementing the *Online* trading system for E*Trade, and his work for Citicorp where he designed and developed a mortgage qualification system and handled the payment processing system that allowed Citicorp to purchase mortgages, bring them in-house and process those payments. Zatkovich Decl. ¶ 6-15; **Ex. 27**, Zatkovich Tr. 11:19-14:25.

## V.     CONCLUSION

For the foregoing reasons, and those set forth in the accompanying Zatkovich Declaration.

Island respectfully requests that the Court adopt its proposed constructions.

Dated:     March 2, 2022                              Respectfully submitted,

                                                      */s/ John Dellaportas*
                                                      **EMMET, MARVIN & MARTIN, LLP**
                                                      John Dellaportas
                                                      NY Bar No. 2688976
                                                      Judith Swartz
                                                      NY Bar No. 5605100
                                                      Emmet, Marvin & Martin, LLP
                                                      120 Broadway
                                                      New York, NY 10271
                                                      Tel: 212-238-3000
                                                      Fax: 212-238-3100
                                                      jdellaportas@emmetmarvin.com
                                                      jswartz@emmetmarvin.com

                                                      *Of Counsel:*

                                                      T. John Ward, Jr.
                                                      Texas Bar No. 00794818
                                                      Claire Abernathy Henry
                                                      Texas Bar No. 24053063
                                                      Andrea L. Fair
                                                      Texas Bar No. 24078488
                                                      Charles Everingham IV
                                                      Texas Bar No. 00787447
                                                      **WARD, SMITH & HILL, PLLC**
                                                      1507 Bill Owens Pkwy.
                                                      Longview, TX 75604
                                                      Tel: (903) 757-6400
                                                      Fax: (903) 757-2323
                                                      Email: jw@wsfirm.com
                                                      Email: claire@wsfirm.com
                                                      Email: andrea@wsfirm.com
                                                      Email: ce@wsfirm.com

                                                      ***Attorneys for Plaintiff***
                                                      ***Island Intellectual Property LLC***

**<u>CERTIFICATE OF SERVICE</u>**

      I hereby certify that a copy of the foregoing document was filed electronically in compliance with Local Rule CV-5(a).  Therefore, this document was served on all counsel who are deemed to have consented to electronic service on this the 2nd day of March, 2022.

<u>*/s/ John Dellaportas*</u>
John Dellaportas