# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF TEXAS
# MARSHALL DIVISION

| | |
|---|---|
| ISLAND INTELLECTUAL PROPERTY, LLC, § | |
| § | |
| *Plaintiff*, § | |
| § | |
| v. § | |
| § | |
| TD AMERITRADE, INC, TD AMERITRADE § | NO. 2:21-CV-00273-JRG |
| CLEARING, INC., TD AMERITRADE § | |
| COMPANY, TD AMERITRADE HOLDING § | |
| CORP, AND THE CHARLES SCHWAB § | |
| CORPORATION, § | |
| § | |
| *Defendants*. § | |

## CLAIM CONSTRUCTION MEMORANDUM OPINION AND ORDER

Plaintiff Island Intellectual Property, LLC, asserts claims from five United States patents against Defendants TD Ameritrade, Inc., TD Ameritrade Clearing, Inc., TD Ameritrade Company, TD Ameritrade Holding Corp., and The Charles Schwab Corporation. Generally, the patents relate to banking and account management. Four of the patents concern "computerized banking techniques" or "account transaction processing." U.S. Patent 7,519,551 at 1:16–17; U.S. Patent 7,680,734 at 1:13–14; U.S. Patent 7,933,821 at 1:15–16; U.S. Patent 8,311,916 at 1:21–22. The fifth patent concerns "flexile interest allocation." U.S. Patent 7,509,286 at 1:23–25.

The parties dispute the scope of four terms from these patents. Having considered the parties' briefing, along with arguments of counsel during a April 13, 2022 hearing, the Court resolves the disputes as follows.

## I.   BACKGROUND

Generally, these patents purport to solve a "problem" caused by a federal law that, at the

time of the earliest effective filing date, prevented banks from paying interest on funds held in certain demand accounts. *See* '551 Patent at 1:21–23. "Demand account" funds can be withdrawn by the depositor without prior notice, although federal regulations defined the term more narrowly for purposes of the interest prohibition. *See generally id.* at 1:30–52 (noting, for example, "a 'demand deposit' includes any deposit for which the depositor is authorized to make more than six fund 'transfers' during any month"). The prohibition on paying interest dated back to the Banking Acts of 1933 and 1935, when Congress sought to encourage more local lending by smaller banks and discourage speculative lending by larger banks. *See* R. Alton Gilbert, *Requiem for Regulation Q: What It Did and Why It Passed Away*, Federal Reserve Bank of St. Louis (Feb. 1986), at 22.[1]

In U.S. Patent 6,374,231, which is related to the patents but not at issue in the proceeding, the inventors taught circumventing this interest-prohibition problem using an aggregate insured money market account linked to multiple demand accounts. This permitted funds to be transferred from those accounts to a money market account where interest could be earned. *See generally* '551 Patent at 1:63–2:15.

However, according to the '551 Patent, this workaround had drawbacks. In particular, it required "significant funds" to comply with applicable banking regulations. *Id.* at 2:16–18. As the patent explains, "[t]his may be difficult in the case of smaller, community-based banks, as these institutions depend upon such funds as a source for loans. Moreover, some bank clients are not comfortable with arrangements that transfer client funds to unfamiliar third parties." *Id.* at 2:19–23.

---

[1] https://research.stlouisfed.org/publications/review/1986/02/01/requiem-for-regulation-q-what-it-did-and-why-it-passed-away/.

Generally, the patents teach another workaround of the prohibition on interest-bearing demand accounts by "allow[ing] a banking institution to retain client deposits on the bank's balance sheets while, at the same time, providing the client . . . with interest on their account balances." '551 Patent at [57]. According to the '551 Patent, the method transfers funds from individual client demand accounts to a pooled insured deposit account and then distributes the interest from that pooled account to individual clients. *Id.* From time to time, the method calculates a net amount of individual client deposits and withdrawals from the demand accounts to determine the amount of funds to be deposited or withdrawn from the pooled account. *Id.* The method then determines whether to deposit or withdraw funds from the pooled deposit account to each of the individual client demand accounts. *Id.* The method then updates a database for each client's deposit and withdrawal activities. *Id.; see also* '916 Patent at [57]. The '821 Patent is directed to a database that can be used to implement the method or system. '821 Patent at [57].

The '286 Patent has a slightly different focus than the other patents and relates to FDIC insurance coverage and flexible interest allocation. As the patent explains, the FDIC insurance coverage limit applies to the total of all accounts held by an individual at a particular financial entity. '286 Patent at 1:49–58. However, funds held in different financial entities but owned by same person are insured separately from each other. *Id.* Thus, as a general matter, three different accounts held by an individual at one institution is less protected than three accounts held by that same individual at three different institutions for the same aggregate amount of money, if the accounts total more than the FDIC insurance limit.

To address this issue, the '286 Patent teaches having a single entity act as agent to manage the funds of multiple ownership interests in aggregate money-market deposit accounts (MMDAs) in one or more "supporting financial entities." *Id.* at 2:20–38. Each supporting entity

holds a single MMDA that is paired with a single direct-deposit account in the same name. When necessary to fully insure all deposited funds, the agent uses multiple MMDA-DDA pairs in different supporting entities. The agent manages client funds so that each client's ownership interest at any one supporting entity never exceeds the FDIC-insurance limit. In addition, the method calculates interest based on the aggregate amount of funds held by a client across all accounts, rather than simply on an account-by-account basis. *See generally id.* at 2:39–60.

The five patents are directly or indirectly related to one another. The '551 Patent, '821 Patent, and '916 Patent share the same lineage and disclosure. '916 Patent at [63]. The '286 Patent and '734 Patent both issued from applications claiming the benefit of the '340 Application, but have different disclosures. '286 Patent at [63]; '734 Patent at [63]. Each patent issued from an application directly or indirectly claiming the benefit of application no. 09/176,340, which the Patent Office issued as U.S. Patent 6,374,231. '551 Patent at [63].

The parties dispute the scope of four terms from the patents. They differ on the proper construction for three terms—"banking institution," "aggregated deposit account," and "a database." In their briefing, Defendants challenge the other term—"on a regular basis"—as indefinite, but the parties reached consensus on that term during the hearing.

## II. LEGAL STANDARDS

### A. Generally

"'[T]he claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting *Innova/Pure-Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). As such, if the parties dispute the scope of the claims, the court must determine their meaning. *See, e.g., Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1317 (Fed.

Cir. 2007); *see also Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 390 (1996), *aff'g*, 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc).

Claim construction, however, "is not an obligatory exercise in redundancy." *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997). Rather, "[c]laim construction is a matter of [resolving] disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims . . . ." *Id.* A court need not "repeat or restate every claim term in order to comply with the ruling that claim construction is for the court." *Id.*

When construing claims, "[t]here is a heavy presumption that claim terms are to be given their ordinary and customary meaning." *Aventis Pharm. Inc. v. Amino Chems. Ltd.*, 715 F.3d 1363, 1373 (Fed. Cir. 2013) (citing *Phillips*, 415 F.3d at 1312–13). Courts must therefore "look to the words of the claims themselves . . . to define the scope of the patented invention." *Id.* (citations omitted). "[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Phillips*, 415 F.3d at 1313. This "person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id.*

Intrinsic evidence is the primary resource for claim construction. *See Power-One, Inc. v. Artesyn Techs., Inc.*, 599 F.3d 1343, 1348 (Fed. Cir. 2010) (citing *Phillips*, 415 F.3d at 1312). For certain claim terms, "the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Phillips*, 415 F.3d at 1314; *see also Medrad, Inc. v. MRI Devices Corp.*, 401 F.3d 1313,

1319 (Fed. Cir. 2005) ("We cannot look at the ordinary meaning of the term . . . in a vacuum. Rather, we must look at the ordinary meaning in the context of the written description and the prosecution history."). But for claim terms with less-apparent meanings, courts consider "'those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean[,] [including] the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art.'" *Phillips*, 415 F.3d at 1314 (quoting *Innova*, 381 F.3d at 1116).

### B.      Indefiniteness

"[A] patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014). "A patent must be precise enough to afford clear notice of what is claimed," but that consideration must be made while accounting for the inherent limitations of language. *Id.* at 908–09. "Indefiniteness must be proven by clear and convincing evidence." *Sonix Tech. Co. v. Publ'ns Int'l, Ltd.*, 844 F.3d 1370, 1377 (Fed. Cir. 2017).

### III.    THE LEVEL OF ORDINARY SKILL IN THE ART

The level of ordinary skill in the art is the skill level of a hypothetical person who is presumed to have known the relevant art at the time of the invention. *In re GPAC*, 57 F.3d 1573, 1579 (Fed. Cir. 1995). In resolving the appropriate level of ordinary skill, courts consider the types of and solutions to problems encountered in the art, the speed of innovation, the sophistication of the technology, and the education of workers active in the field. *Id.* Importantly, "[a] person of ordinary skill in the art is also a person of ordinary creativity, not an automaton." *KSR*

*Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 421 (2007).

Here, the parties generally agree on the level of skill in the art at the time of invention. Island contends a skilled artisan "would be a person with knowledge of financial or banking services that provide financial transactions in accordance with legal requirements, and the qualification of such an individual could be obtained by having a Bachelor's degree and working on design, implementation, development, and/or sale of such financial or banking services for at least three years." Dkt. No. 54 at 3 (quoting Zatkovich Decl., Dkt. No. 54-31 ¶ 27). Defendants contend a skilled artisan would have had "at least a bachelor's degree in business or finance with coursework that covers banking, as well as at least three years of experience in the field of computerized banking techniques, including account transaction processing[.]" Dkt. No. 55 at 7 (citing Kursh Decl., Dkt. No. 55 at 9–10).

Despite the differences in their proposed levels of ordinary skill, the parties agree that resolving these differences may not be necessary to arrive at the correct construction for the dispute terms. Dkt. No. 54 at 3; Dkt. No. 55 at 7. The Court agrees with that sentiment.

## IV. THE DISPUTED TERMS

### A. "banking institution" ('551 Patent, Claims 1, 11, 17, 27, 33; '821 Patent, Claim 19; '734 Patent, Claims 1, 5, 8, 12)

| Plaintiff's Construction | Defendants' Construction |
|---|---|
| "an organization which comprises at least a bank, and may include other financial institutions such as a broker dealer within its infrastructure" | "an institution that is chartered as a bank under the laws of the United States or any State in the United States, or that meets the definition of 'bank' in 12 U.S.C. § 1813(a)" |

This term appears in different contexts within the claims. In some claims, deposit accounts are held in banks of banking institutions. For example, Claim 1 of the '551 Patent recites

"maintaining a plurality of FDIC-insured and interest-bearing aggregated deposit accounts, each aggregated deposit account held *in a different respective bank of a different respective banking institution.*" '551 Patent at 9:54–59 (emphasis added); *see also* '821 Patent at 14:14–20 (referring to accepting funds "for deposit in the names of the respective clients at a first banking institution that includes a first bank in its infrastructure"). Other claims omit this bank-of-a-banking-institution concept and simply require a "banking institution." *See, e.g.*, '551 Patent at 11:12–16 (reciting, in Claim 11, a method "for managing funds . . . accepted for deposit in respective client accounts held in the names of the respective different clients at a first banking institution"); '734 Patent at 6:22–31 (requiring funds to be "held in one or more FDIC insured banking institutions").

The parties dispute whether "banking institution" *includes*, but is not limited to a bank, or whether it *is* a bank. Island relies primarily on language submitted late during prosecution, which explains "the term 'banking institution' as used in these claims is to be interpreted broadly and includes an organization which comprises at least a bank and may include other financial institutions such as a broker dealer within its infrastructure." Dkt. No. 54 at 4 (quoting Second Supp. Am., Dkt. No. 54-7 at 14–15). Island also cites excerpts from the specification explaining entities that hold client accounts may be banks, savings institutions, brokerage firms, or any other entity where financial transactions take place. *Id.* (citing '551 Patent at 8:7–9; '821 Patent at 8:6–8).

Defendants, on the other hand, contend the claim language and specification both show a "banking institution" must be a bank. The claims, they say, require FDIC-insured accounts at the "banking institution," and FDIC insurance is only available for bank accounts. Dkt. No. 55 at 8. From the specifications, Defendants cite excerpts explaining a purpose of the invention is "to allow a banking institution to retain client deposits on the bank's balance sheet" and hold funds

at an insured deposit account at the client's banking institution. *Id.* at 9 (citing '551 Patent at [57], 2:63–67, 3:7–14).

Courts presume different words in the claims have different meanings. *Applied Med. Res. Corp. v. U.S. Surgical Corp.*, 448 F.3d 1324, 1333 n.3 (Fed. Cir. 2006) ("[T]he use of two terms in a claim requires that they connote different meanings[.]"); *CAE Screenplates Inc. v. Heinrich Fiedler GmbH & Co. KG*, 224 F.3d 1308, 1317 (Fed. Cir. 2000) ("In the absence of any evidence to the contrary, we must presume that the use of these different terms in the claims connotes different meanings."). Thus, where the same claim refers to both a "bank" and a "banking institution"—especially where the former composes the latter—the Court presumes these terms mean different things.

Defendants' construction, on the other hand, leads to an awkward interpretation of the claim language—"a bank of a bank" in some claims, and "a bank having a bank within its infrastructure" in others. Defendants suggest this interpretation is reasonable because a bank can own another bank, but the Court rejects that interpretation as irrelevant to the inventions' purpose. The specification provides no reason or necessity for two banks, one of which owns the other, in the claimed methods. Moreover, a skilled artisan (as defined by Defendants) would not expect a second bank from the claim language. Thus, between the two proffered constructions, Island's is more reasonable.

Here, Defendants have not overcome the presumption that "bank" and "banking institution" have different meanings. That said, "organization" in Island's construction is too broad. The Court construes "banking institution" as "a financial entity which comprises at least a bank."

B.     "on a regular basis" ('734 Patent, Claims 1, 8)

| Plaintiff's Construction | Defendants' Construction |
|---|---|
| "Regularly; occurring in regular time intervals or patterns, e.g. daily, weekly, monthly, on a business day." | Indefinite. |

These claims are directed to computer-implemented methods "for managing a plurality of client accounts for a plurality of clients." The method includes the step of "determining . . . *on a regular basis* one or more net transactions as sums of said deposits to and withdrawals from said client accounts." '734 Patent at 6:38–40 (Claim 1); *see also id.* at 7:42–44 (Claim 8). From that "determining" step, the claimed methods decide "whether to deposit funds to or withdraw funds from said one or more FDIC-insured and interest-bearing aggregated deposit accounts." '734 Patent at 6:38–40 (Claim 1); *see also id.* at 7:45–48 (Claim 8).

Despite their briefing, the parties now agree on the proper scope of "on a regular basis." Defendants once claimed Island's construction was unclear about whether "on a regular basis" was limited to time, or whether it could be transaction-based. However, during the hearing, the parties agreed that a "regular basis" could be based on time intervals or some other pattern, which aligns with the Court's understanding of the term. Moreover, the parties agreed that "plain and ordinary meaning" is sufficient for this term. *See generally* H'rg Tr., Dkt. No. 67 at 48:13–51:5. Accordingly, the Court will instruct the jury to give this term its plain and ordinary meaning. The term is not indefinite.

C. "aggregated deposit account" ('551 Patent, Claims 1, 6, 11, 17, 18, 23, 27, 33; '821 Patent, Claims 19, 21, 23; '916 Patent, Claims 1, 2, 5, 6, 8, 13; '286 Patent, Claim 1; '734 Patent, Claims 1, 5, 8, 12, 15, 16)

| Plaintiff's Construction | Defendants' Construction |
|---|---|
| "a deposit account which holds funds for a plurality of different clients and not multiple accounts of the same client being aggregated" | Plain and ordinary meaning. |

The parties agree an "aggregated deposit account" can hold funds for multiple clients, but Defendants dispute whether an account holding only funds from one client is within the term's scope. They allege Island's position is inconsistent with the claim language. Dkt. No. 55 at 21. Island contends the applicants coined the term, Dkt. No. 54 at 15, and that Defendants' position is nonsensical in the context of the patents, which aim to "obtain FDIC insured, interest-bearing accounts" with insurance that may exceed the FDIC limit, *id.* at 17. Moreover, to the extent the plain and ordinary meaning of the term might align with Defendants' position, Island alleges the applicants disclaimed aggregating multiple accounts of the same customer in the prosecution history. *Id.* at 16.

The alleged disclaimer appears in the prosecution history of the '734 Patent. At the time of the relevant rejection, the independent claims of the underlying application read as they issued. The examiner rejected those claims based in part on a Merrill Lynch marketing document, asserting the document disclosed the "accessing . . . a database" limitations of the claims. *See* Amendment Under 37 C.F.R. 111 (Nov. 3, 2009), Dkt. No. 54-20 at 9. In their response, the applicants stressed the cited portion of the document used "aggregated" twice, both times referring only "to aggregating balances **held** in different accounts of the same account holder . . . **Not** aggregating funds of different account holders to be held in the same account." *Id.* at 10 (emphasis

in original). The applicants further explained the cited portion of the document "**says nothing about large aggregated** deposit accounts **holding** the funds of **many different clients aggregated in** the respective large aggregated account." *Id.* (emphasis in original). The examiner issued a notice of allowance shortly thereafter, citing the applicants' remarks in the reasons for allowance. Notice of Allowance (Dec. 11, 2009), at 2.

This amounts to clear and unmistakable disclaimer, and Defendants do not contend otherwise with respect to the '734 Patent. *See* Dkt. No. 55 at 20. Instead, they assert the statement on which Island relies is not part of the chain of applications that led to the four other patents. *Id.* Thus, the Court must decide the extent to which this disclaimer applies to claims of the other patents at issue.

"Disclaimer during the prosecution of one patent applies to other patents in the same family when the patents are directly related, such as through a parent-child relationship." *Capital Machine Co. v. Miller Veneers, Inc.*, 524 Fed. App'x 644, 649 n.1 (Fed. Cir. 2013). "If the patents at issue are familial, but not directly related, the question whether disclaimer applies will depend on the facts of the case." *Id.*; *see also Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340, 1349 (Fed. Cir. 2004) (concluding a statement made during prosecution of one patent is relevant to an understanding of the common disclosure in sibling patents).

Here, the Office granted the '551 Patent from application no. 10/071,053, which is the earliest application at issue in this proceeding. The '734 Patent was granted from application no. 10/305,439, which was a continuation in part of the '053 Application, so the '734 Patent is a "child" of the '551 Patent. The '286 Patent and '821 Patent are siblings to the '734 Patent, each being a "child" of the '551 Patent. The '916 is a "grandchild" of the '551 Patent, and shares a common disclosure with both the '551 Patent and the '821 Patent. Given the similar subject mat-

ter and claims, as well as the incorporation by reference of the '551 Patent's disclosure by the '821 Patent, '916 Patent, and '734 Patent,[2] the Court concludes on this record the disclaimer should apply to all claims at issue.

However, even without disclaimer, the Court would arrive at the same construction for this term. Each of the patents explains their inventions provide a system for managing accounts for multiple clients using a single insured deposit account. *See, e.g.*, '734 Patent at 2:19–37 ("this invention provides a system for managing a plurality of accounts for multiple clients"); '551 Patent at 1:66–2:1 (characterizing the '340 Application as describing a system for managing a plurality of accounts for multiple clients); *id.* at 2:4–7 ("The system provides an aggregate insured money market deposit account at a bank or savings institution that is not necessarily an institution at which any of the client accounts are held."); *id.* at 2:63–67 (noting the invention aims "to provide a banking method that manages a plurality of demand accounts for multiple clients whose funds are held in an aggregate insured deposit account"); '286 Patent at 2:4–7 (explaining the inventors "conceived an implemented arrangements whereby a single [legal entity] acts as an agent of numerous individuals or other ownership interests"); *id.* at 2:20–22 ("this invention provides systems and methods for managing a plurality of Clients of one or Customer financial entities"). Defendants, on the other hand, cite nothing from the intrinsic evidence suggesting the "aggregation" concerns something other than accounts of multiple clients. Indeed, they recognize the "basic idea" of the inventions is "one entity administering the accounts of many, many people, and you aggregate them all together." H'rg Tr., Dkt. No. 67 at 23:7–9.

Thus, even in the absence of disclaimer, the intrinsic record confirms the correct construction of "aggregated deposit account" is "deposit account which holds funds for a plurality of

---

[2] The '286 does not incorporate any applications or patents by reference.

different clients." As such, a deposit account holding only funds of one client does not fall within the scope of this term as used in the claims.

      D.      "electronic database" ('551 Patent, Claims 1, 11, 18, 27; '916 Patent, Claims 1, 6; '821 Patent, Claims 19, 21; '286 Patent, Claim 1; '734 Patent, Claims 1, 8, 15, 16)

| Plaintiff's Construction | Defendants' Construction |
|---|---|
| "Database" means "an organized collection of information stored in one or more computerized files" | a single electronic database |

Each of these claims generally recites maintaining and updating "a database." *See, e.g.*, '551 Patent at 9:60–61 (reciting, in Claim 1, the step of "maintaining or having maintained an electronic database, on one or more computer-readable media"), 10:15–17 ("updating or having updated the electronic database based on the transfers to and withdrawals in the plurality of aggregated deposit accounts"); '916 Patent at 9:55–56 (reciting, in Claim 1, the step of "accessing, using one or more computers, one or more electronic databases"), 10:48–51 ("updating or having updated, using the one or more computers, the one or more electronic databases based at least in part on the allocation of client funds to or from the plurality of aggregated deposit accounts").

The parties' briefing reveals two disputes about this term. First, Defendants objected to Island's construction for "database" as overly broad. Dkt. No. 55 at 24 (arguing "[a] database could be stored in or comprise computerized files, but that is not a definitional characteristic"). Second, the parties dispute whether "a database" or "an electronic database" is limited to a single database, as Defendants suggest, or whether it means "one or more databases." In support of the latter, Island cites *Baldwin Graphic Sys., Inc. v. Siebert, Inc.*, 512 F.3d 1338 (Fed. Cir. 2008) for the rule that "a" or "an" can mean "one or more."

As to the first issue—the propriety of Island's construction—Defendants are correct. A database is more than just an organized collection of computerized information. Rather, a database is arranged to accomplish some purpose, such as "for ease and speed of retrieval" or "to permit a user to store and retrieve related information." Dkt. No. 54 at 20 (citing dictionary definitions). In other words, a database requires more than just organization, it requires some structure. Indeed, Island acknowledged as much during the hearing, which obviates the need for any construction of "database." H'rg Tr., Dkt. No. 67 at 70:12–71:12.

Concerning the second issue, Defendants do not dispute the applicability of *Baldwin*'s general rule if they cannot show the intrinsic record necessitates a departure from it. Dkt. No. 55 at 24. Attempting to show such a necessity, they make two arguments. First, relying on *Motorola Mobility, LLC v. I.T.C.*, 553 Fed. App'x 971 (Fed. Cir. 2014), Defendants assert the claim language is nonsensical if the same database is not used to track deposits and withdrawals for each client. *Id.* at 23–24. Second, the applicants' use of "one or more databases" elsewhere in the claims and patents clearly shows intent to limit "a database" to only one. *Id.* at 26–27.

Neither of these arguments is persuasive. For one, Defendants make no showing that the use of "one or more" in some cases and "a" or "an" in others necessitates a departure from the general rule. Regarding *Motorola Mobility*, the claim language at issue was fundamentally different from the language at issue here. Specifically, the claim recited a "subscriber unit" (e.g., a smartphone) comprising, among other limitations, a processor system programmed to

> maintain an application registry comprising a list of all software applications that are currently accessible to the subscriber unit; and
>
> in response to a change in accessibility of an application, update the application registry; and

> control the transmitter *to communicate the change* to the fixed por-
> tion of the wireless communication system.

*Motorola Mobility*, 553 Fed. App'x at 973 (emphasis added). Relying partly on *Baldwin*'s general rule, the patentee argued this language did not require communication of *every* change in accessibility, and that communication of only some changes was sufficient to infringe. *Id.* at 974–75. However, the appellate court rejected that argument because "the claim uses 'and' and not 'or' to describe what must occur in response to 'a change in accessibility,'" which was the only antecedent basis for "the change." *Id.* at 975. Thus, the court concluded "the change that causes an update to the application registry must be the same change that is communicated to the fixed portion of the wireless network." *Id.* The court also noted this construction was consistent with various other aspects of the specification. *Id.*

Whereas *Motorola Mobility* related to the programming of a processor system, the claims here simply recite "a database," and construing the term as "one or more databases" in line with the general rule presents no issues as to the conjunctive or disjunctive nature of the other claim limitations. For example, Claim 1 of the '551 Patent recites "maintaining . . . an electronic database . . . containing information on funds held by each client," '551 Patent at 9:60–62, and "updating . . . the electronic database based on the transfers to and withdrawals in the plurality of aggregated deposit accounts," *id.* at 10:15–17. There is no reason why the general rule could not apply, in which case these limitations would effectively read "maintaining . . . [one or more] electronic database[s] . . . containing information on funds held by each client," and "updating . . . the [one or more] electronic database[s] based on the transfers to and withdrawals in the plurality of aggregated deposit accounts." Not only is this interpretation reasonable in light of the disclosures, Defendants present no *technical* reason why the same objective of updating deposits

and withdrawals, along with clients' relative shares of aggregate accounts, would not be accomplished by organizing the clients' information into "one ore more" databases.

In short, the Court disagrees with Defendants that the claims require a single database that satisfies the method steps recited in the claims. Defendants have not shown the claims, specification, or prosecution history necessitate a departure from the general rule that "a" or "an" can mean "one or more." Accordingly, the Court construes "a database" and "an electronic database" as "one or more databases" and "one or more electronic databases," respectively.

## V. CONCLUSION

| Term | The Court's Construction |
| --- | --- |
| "banking institution" ('551 Patent, Claims 1, 11, 17, 27, 33; '821 Patent, Claim 19; '734 Patent, Claims 1, 5, 8, 12) | "a financial entity which comprises at least a bank" |
| "on a regular basis" ('734 Patent, Claims 1, 8) | Plain and ordinary meaning |
| "aggregated deposit account" ('551 Patent, Claims 1, 6, 11, 17, 18, 23, 27, 33; '821 Patent, Claims 19, 21, 23; '916 Patent, Claims 1, 2, 5, 6, 8, 13; '286 Patent, Claim 1; '734 Patent, Claims 1, 5, 8, 12, 15, 16) | "deposit account which holds funds for a plurality of different clients" |
| "a[n electronic] database" ('551 Patent, Claims 1, 11, 18, 27; '916 Patent, Claims 1, 6; '821 Patent, Claims 19, 21; '286 Patent, Claim 1; '734 Patent, Claims 1, 8, 15, 16) | "one or more [electronic] databases" |

The Court **ORDERS** each party not to refer, directly or indirectly, to its own or any other party's claim-construction positions in the presence of the jury. Likewise, the Court **ORDERS** the parties to refrain from mentioning any part of this opinion, other than the actual positions

adopted by the Court, in the presence of the jury. Neither party may take a position before the jury that contradicts the Court's reasoning in this opinion. Any reference to claim construction proceedings is limited to informing the jury of the positions adopted by the Court.

**So ORDERED and SIGNED this 20th day of May, 2022.**

_____
RODNEY GILSTRAP
UNITED STATES DISTRICT JUDGE